**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| : | |
| ROUGE STEEL INDUSTRIES, INC., et al., | Case No. 03-13272 |
| : | |
| ROUGE STEEL COMPANY, | |
| : | |
|    Appellant (Plaintiff-Below), | |
| : | Civ. Act. No. 1:06-cv-250 (MPT) |
| v. | |
| : | |
| OMNISOURCE CORPORATION – FORT WAYNE BROK, | |
| : | |
|    Appellee (Defendant-Below). | |

## OPENING BRIEF IN SUPPORT OF ROUGE STEEL COMPANY'S APPEAL

**LANDIS RATH & COBB LLP**
Daniel B. Rath (No. 3022)
Rebecca L. Butcher (No. 3816)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel to the Appellant
Rouge Steel Company

Dated: March 9, 2007

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ iii

<u>INTRODUCTION</u> .......................................................................................1

<u>NATURE AND STAGE OF THE PROCEEDINGS</u> ...........................................2

<u>STATEMENT OF FACTS</u> ............................................................................3

    A.  The Pre-Petition Business Relationship...............................................3

    B.  Rouge's Petition ...........................................................................3

    C.  The Demand Letters .......................................................................4

    D.  The Complaint Against Brok ...........................................................5

    E.  The Motion to Amend and Judge Lindsey's Decision ........................7

<u>SUMMARY OF ARGUMENT</u> .....................................................................9

<u>ARGUMENT</u> ...........................................................................................11

I.  On Appeal, the Denial of a Motion to Amend Is Reviewed for Abuse of Discretion...11

II.  The Bankruptcy Court Committed an Abuse of Discretion because, on the
    Undisputed Facts, the Amendment Should Relate Back and therefore Is Not
    Futile ...................................................................................................11

    A.  The Bankruptcy Court's Decision Was Based on an Erroneous
        Application of Rule 15(c)(2)...........................................................11

    B.  The Bankruptcy Court Erred in Applying the Undisputed Facts to the Law...13

        (i)  Judge Lindsey should have considered that the Complaint and
            extrinsic facts provided notice that Rouge sought to avoid the
            Brok Transfers. .................................................................13

        (ii)  Judge Lindsey should have considered that the Complaint alone
            provided notice that Rouge sought to avoid the Brok Transfers. ........16

    C.  The Bankruptcy Court Committed an Abuse of Discretion by Relying on
        Cases in the Memorandum and Order that Are Factually
        Distinguishable and Did Not Include Clerical Errors ......................17

(i)  The cases on which the Bankruptcy Court relied are inapposite. ..17

(ii)  Judge Lindsey should have considered cases that address the impact of a clerical mistake. ........................................................19

III.  Alternatively, The Bankruptcy Court Abused its Discretion in not Considering the Equities of the Case and not Allowing Rouge to Amend the Complaint ...........22

CONCLUSION................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Coan v. O & G Industries, Inc. (In re Austin Driveway Services, Inc.),*
179 B.R. 390 (Bankr. D. Conn. 1995) ................................................................. 18, 19

*Estate of the IT Group, Inc. v. Brandywine Apartments (In re The IT Group, Inc.),*
313 B.R. 370 (Bankr. D. Del. 2004) (J. Lindsey) ....................................................... 22

*Foman v. Davis,*
371 U.S. 178 (1962) ............................................................................................ 12

*Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.),*
327 B.R. 711 (Bankr. D. Del. 2005) ............................................................. 13, 16, 17

*Gordon v. Slaughter (In re Slaughter Co. & Associates, Inc.),*
242 B.R. 97 (Bankr. N.D. Ga. 1999) .................................................................. 18, 19

*Green v. Walsh,*
21 F.R.D. 15 (E.D. Wis. 1957) ............................................................................. 14

*Huber Oil of Louisiana, Inc. v. State of Louisiana (In re Huber Oil of Louisiana),*
311 B.R. 440 (Bankr. W.D. LA) ................................................................... 19, 20, 21

*I.L.G.W.U. Nat'l Retirement Fund v. Meredith Grey, Inc.,*
190 F.R.D. 324 (S.D.N.Y. 1999) ............................................................................ 12

*IDHG Litigation Trust v. Westaff (USA), Inc. (In re Imperial Home Decor Group, Inc.),*
2005 Bankr. LEXIS 264 (Bankr. D. Del. Feb. 24, 2005) ........................................ 23, 24

*In re Del-Met Corp.,*
322 B.R. 781 (Bankr. M.D. Tenn. 2005) .................................................................. 14

*In re Walls & All,*
127 B.R. 115 (E. D. Pa. 1991) .............................................................................. 11

*IT Litigation Trust v. D'Aniello,*
2005 U.S. Dist. LEXIS 27869 (D. Del. Nov. 15, 2005) ............................................... 22

*Keitt v. John Doe,*
1994 U.S. Dist. LEXIS 10026 (E.D. Pa. July 25, 1994) ............................................... 14

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
305 F.3d 140 (3d Cir. 2002) ................................................................................. 11

*Lake v. Arnold,*
232 F.3d 360 (3d Cir. 2000) ................................................................................. 11

iii

*Little v. United States,*
317 F. Supp. 8 (E.D. Pa. 1970) ............................................................................ 19, 20, 21

*Mackensworth v. S.S. American Merchant,*
28 F.3d 246 (2nd Cir. 1994) .................................................................................... 12

*Malloy v. Mulkey Tire, Inc.,*
279 B.R. 297 (Bankr. N.D. Okla. 2002) .................................................................. 12

*Michener v. Brady (In re Brady),*
243 B.R. 253 (E.D. Pa. 2000) ................................................................................. 11

*Neilson v. Southern (In re Webvan Group, Inc.),*
2004 Bankr. LEXIS 269 (Bankr. D. Del. March 9, 2004) ........................................ 22

*New Bedford Capacitor, Inc. v. Sexton Can Company, Inc. (In re New Bedford Capacitor, Inc.),*
301 B.R. 375 (Bankr. D. Mass. 2003) ................................................................. 18, 19

*O'Loughlin v. National Railroad Passenger Corporation,*
928 F.2d 24 (1st Cir. 1991) .................................................................................. 13, 14

*Pardo v. Gonzaba (In re APF Co.),*
308 B.R. 183 (Bankr. D. Del. 2004) ..................................................................... 23, 24

*Peltz v. CTC Direct, Inc. (In re MBC Greenhouse Co.),*
307 B.R. 787 (Bankr. D. Del. 2004) ................................................................ 8, 17, 18

*Posman v. Bankers Trust Co., (In re Lomas Financial Corp.),*
1999 WL 33742299 (Bankr. D. Del. July 28, 1999) ............................................. 23, 24

*Randall's Island Family Golf Centers, Inc. v. Acushnet Co. and Fortune Brands, Inc.,*
290 B.R. 55 (Bankr. S.D.N.Y. 2003) (same) .............................................................. 23

*Senger v. Soo Line Railroad Co.,*
493 F. Supp. 143 (D. Minn. 1980) ............................................................................ 14

*Taylor v. Reading Company, Inc.,*
23 F.R.D. 186 (E.D. Pa. 1958) ................................................................................. 14

*TWA Inc. v. Marsh USA Inc. (In re TWA Inc. Post Confirmation Estate),*
305 B.R. 228 (Bankr. D. Del. 2004) ..................................................................... 23, 24

*Valley Media v. Borders (In re: Valley Media),*
288 B.R. 189 (Bankr. D. Del. 2003) ................................................................ 22, 23, 24

iv

*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
438 F.2d 1286 (5th Cir. 1971) .......................................................................................... 12

**Statutes**
11 U.S.C. § 546............................................................................................................ 5, 12, 14

11 U.S.C. § 547................................................................................................................. 5, 12

28 U.S.C. § 158(a) .................................................................................................................. 2

**Other Authorities**
Wright & Miller, 6A FEDERAL PRACTICE & PROCEDURE §1497 (Rev. 2005)........................ 15, 17

**Rules**
Fed. R. Bankr. P. 7015..................................................................................................... 12

Fed. R. Civ. P. 15 ....................................................................................................... passim

## INTRODUCTION

Rouge Steel Company ("Rouge") appeals to this Court from an opinion dated January 19, 2006 by visiting Judge Paul B. Lindsey of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") denying Rouge's motion to amend a preference complaint. Judge Lindsey failed to apply clear statutory language and misapplied inapposite caselaw, improperly concluding that the proposed amendment to the Complaint did not relate back to the date of the original pleading. This case represents the rare instance where a truly clerical and technical error—having no impact on notice and causing no prejudice to the defendant—has threatened a trial on the merits of a claim with a value to the estate of nearly $3 million.

The discrete issue raised by Rouge's motion to amend was not considered in Judge Lindsey's decision; therefore, the trial court abused its discretion in denying the motion. Judge Lindsey should have considered whether Rouge met the standard expressly set forth in the language of Rule 15(c)(2), allowing an amended pleading to relate back to the original complaint if the claim in the amended pleading arose out of the conduct "<u>attempted to be</u> set forth in the original pleading." Judge Lindsey erred in holding Rouge to a higher standard. The lower court held that the claim in the amended pleading must have arisen from conduct, transaction or occurrence <u>set forth in</u> the Complaint. The lower court did not use the <u>attempted to be set forth</u> standard required by Rule 15(c)(2). Thus, by not considering whether Rouge attempted to set forth in the Complaint the roughly $3 million in transfers, Judge Lindsey abused his discretion. This Court should reverse Judge Lindsey's Memorandum and Order and remand the case to the Bankruptcy Court for a trial on the merits of Rouge's claims as set forth in the Amended Complaint.

## **NATURE AND STAGE OF THE PROCEEDINGS**

This appeal arises out of appellant Rouge's Motion for Leave to File an Amended Complaint ("Motion to Amend") in underlying adversary proceeding, *Rouge Steel Co. v. OmniSource Corp.-Fort Wayne Brok*, Adv. Pro. No. 05-52242. Rouge's Motion to Amend was filed on November 4, 2005, and sought to correct the mistaken attachment of an incorrect exhibit to its complaint to avoid preferential transfers against OmniSource Fort Wayne Brok ("Brok"). On January 19, 2006, Judge Lindsey, a visiting judge presiding in the Delaware Bankruptcy Court, issued a Memorandum and Order Denying Motion of Plaintiff for Leave to File an Amended Complaint. [Bankr. D.I. No. 35].

On January 27, 2006, Rouge filed a Motion for Leave to File an Appeal under 28 U.S.C. § 158(a), appealing the Bankruptcy Court's decision in the Memorandum and Order ("Appeal"). [Bankr. D.I. No. 37, D.I. No. 1]. That motion was not opposed by Brok. Rouge and Brok further filed a joint motion to stay the deadlines in the adversary proceeding pending the resolution of the Appeal. [Bankr. D.I. No. 41]. The request for stay was granted by the Bankruptcy Court on February 28, 2006. [Bankr. D.I. No. 47]. This Court granted Rouge leave to appeal the Memorandum and Order on April 17, 2006. [D.I. No. 3]. After leave to appeal was granted, the matter was referred to mediation.

The mediation took place on December 18, 2006. The mediator filed a Notice of Completion of Mediation on December 20, 2006. [D.I. No. 11]. Pursuant to a request by the Court, the parties filed stipulated briefing schedules on January 14, 2007, February 16, 2007 and on March 1, 2007. [D.I. Nos. 13, 14, 15]. This opening brief is submitted in support of Rouge's Appeal.

2

## STATEMENT OF FACTS

A.         **The Pre-Petition Business Relationship**

Rouge and its affiliated entities were engaged in the production of high quality

flat rolled carbon steel products consisting of hot rolled, cold rolled and galvanized steel.

Rouge's products were generally sold to customers in the automotive industry, such as Ford,

General Motors Corporation and Daimler Chrysler AG.     OmniSource Corporation

("OmniSource"), located in Fort Wayne, Indiana, is in the scrap metal processing, transportation,

marketing and brokerage business.

Rouge and OmniSource had done business together since September 1998.  Since

at least June 2002, and at OmniSource's specific request, Rouge had in its transaction data

systems two different accounts for OmniSource detailing two separate sets of transactions.  One

account was titled "OmniSource Corporation-Fort Wayne Brok" and contained data with respect

to a large number of transactions between Rouge and Brok.  Brok was assigned individual

vendor number 5432 in Rouge's accounting system.  Payments made by Rouge toward invoices

for this account reflect that the payee was Brok.

A second much smaller account, titled "OmniSource Corporation-Fort Wayne"

("Fort Wayne"), contained data relating to transfers made between Rouge and Fort Wayne.

Payments on this account were made payable to Fort Wayne.  This account was assigned vendor

number 8670 and contained a much more limited number of transfers.  Still, the Brok account

and the Fort Wayne account remained "OmniSource" accounts.

B.         **Rouge's Petition**

On October 23, 2003 ("Petition Date"), Rouge Industries, Inc., Rouge Steel

Company, QS Steel, Inc., and Eveleth Taconite Company (collectively, the "Debtors") each filed

with the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") a voluntary petition for relief under chapter 11 of the Bankruptcy Code, title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No examiner or trustee has been appointed in these cases.

## C.        The Demand Letters

More than a year before the expiration of the two-year statute of limitations for filing preference actions, Rouge began its due diligence to determine available causes of action under the Bankruptcy Code. Specifically, Rouge analyzed the relationship it had with OmniSource. Rouge's records for the Brok account revealed preferential transfers totaling $2,903,343.83 from Rouge to Brok within ninety (90) days of the Petition Date, July 25, 2003 through October 23, 2003 ("Preference Period"). Rouge's records for the Fort Wayne account reflected Preference Period transfers of $70,240.94. Rouge proceeded to separately notify Brok and Fort Wayne of the claims.

On September 21, 2004, Rouge sent a letter to Brok explaining that payments in the amount of at least $2,903,343.83 were made by Rouge to Brok during the Preference Period ("Transfers"). The September 21, 2004 Letter is attached hereto as Exhibit A of the Appendix (cited herein as "A-__") at A-1. Rouge sent another letter on the same day detailing the claims related to $70,240.94 in transfers to Fort Wayne. This letter is attached hereto as Exhibit B of the Appendix at A-8.

On October 13, 2004, OmniSource, by its attorney, responded in writing to Rouge and acknowledged Rouge's potential claims for preferential transfers. OmniSource requested

528.001-15795.DOC

additional documentary support for the claims relating to the Brok and Fort Wayne accounts. The October 13, 2004 letter is attached hereto as Exhibit C of the Appendix at A-15.

On November 19, 2004, Rouge wrote a letter to Brok and provided complete records and full documentation supporting the $2,903,343.83 in transfers relating to the preference claim (the "November Brok Letter"). This letter detailed the transactions at issue, including date, check number, invoice number, invoice date, check clear date, check amount and invoice amount. The November Brok Letter is attached hereto as Exhibit D of the Appendix at A-16. Rouge also provided information relating to each transaction for over a year prior to the Petition Date and checks made payable to Brok from the previous year. Further, Rouge provided its analysis of Brok's potential new value defenses to Rouge's claim. *See* A-17.

Rouge wrote a second letter on November 19, 2004 addressed to Fort Wayne. This letter enclosed the records and documentation supporting Rouge's $70,240.94 preference claim against Fort Wayne. Rouge provided a detail of the transactions at issue, including date, check number, invoice number, invoice date, check clear date, check amount and invoice amount relating to the Fort Wayne account. This letter is attached hereto as Exhibit E of the Appendix at A-57.

**D.      The Complaint Against Brok**

Rouge received no response to its November 19, 2004 letters verifying the payments made to Fort Wayne and Brok. Pursuant to 11 U.S.C. § 546, Rouge had two years from the Petition Date to file its actions against creditors for preferential transfers under Bankruptcy Code section 547. Therefore, on August 4, 2005, more than eleven weeks prior to the expiration of the statute of limitations on October 23, 2005, Rouge filed its "Complaint To Avoid Certain Preferential Transfers, To Recover Property And For Related Relief" (the

"Complaint") against Brok. The Complaint is attached hereto as Exhibit F of the Appendix at A-86. The underlying adversary proceeding was assigned to visiting Judge Paul B. Lindsey ("Adversary Proceeding").

Rouge did not pursue a preference action against Fort Wayne. Rouge determined that Fort Wayne had viable affirmative defenses that diminished significantly the potential value of the claim for the estate.

The Complaint explicitly identifies Brok as the defendant—both in the caption and throughout the text. *See* A-86. The Summons and Notice of Pretrial Conference were directed to and served on Brok. [Bankr. D. I. No. 2]. Consistent with Rouge's attempts to sue Brok for the Transfers, the docket for the Adversary Proceeding reflects the amount of Plaintiff's "demand" as $3,000,000. The docket listing is attached hereto as Exhibit G to the Appendix at A-92. Through a clerical mistake, Rouge unintentionally attached the wrong document as an exhibit to the Complaint. The document incorrectly attached identifies and lists the transfers of $70,240.94 made to vendor Fort Wayne. *See* Complaint, A-91. There is no secret as to what happened—Rouge attempted to sue Brok to collect $3 million in preferential transfers and inadvertently attached the exhibit detailing the transfers to Fort Wayne

Brok filed the Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint to Avoid Certain Preferential Transfers, to Recover Property and for Related Relief on September 6, 2005. [Bankr. D.I. No. 7]. The Answer is attached hereto as Exhibit H of the Appendix at A-93. Brok did not object to the designation of "OmniSource Corporation-Fort Wayne Brok" as the defendant, and the signature block to the Answer specified that it was filed by counsel to OmniSource Brok, not Fort Wayne.

6

On October 27, 2005 a scheduling order was entered in the Adversary Proceeding. [Bankr. D.I. No. 20]. On November, 1, 2005, counsel for Brok served Rouge with discovery requests. [Bankr. D.I. No. 21]. Upon review of those discovery requests, counsel for Rouge discovered the clerical mistake that had been made in filing the Complaint against Brok.

E.        **The Motion to Amend and Judge Lindsey's Decision**

Rouge immediately filed its Motion to Amend the Complaint seeking leave to attach the appropriate exhibit. [Bankr. D.I. No. 24]. The Motion to Amend is attached hereto as Exhibit I of the Appendix at A-98. The only difference between the Brok Complaint and the proposed amended complaint was the replacement of the exhibit detailing the Brok transfers. *See* Amended Complaint, attached hereto as Exhibit J of the Appendix at A-102. The Motion to Amend was filed on November 4, 2005, twelve calendar days after the statute of limitations had run for Rouge to file preference claims. Brok filed its Memorandum of Law in Response to Plaintiff's Motion for Leave to File an Amended Complaint on November 14, 2005. [Bankr. D.I. No. 27]. The Response Memorandum is attached hereto as Exhibit K of the Appendix at A-129. On November 30, 2005, Rouge filed Plaintiff Rouge Steel Company's Reply Brief in Support of Its Motion for Leave to File an Amended Complaint. [Bankr. D.I. No. 28]. Rouge's Reply Brief is attached hereto as Exhibit L of the Appendix at A-135.

Rouge made several arguments in its briefs supporting the Motion to Amend. All the relevant facts were set forth as above, highlighting that Brok had actual notice of the specific transfers at issue and that Rouge attempted to sue Brok for transfers of approximately $3 million. Rouge argued below that:

- it acted diligently in pursuing the $3 million in preferential transfers well before the limitations period expired [Mot. to Amend at 3, A-131; Reply Br. at 5-6, A-144-45];

- the Motion to Amend was based on a clerical error, not the discovery of additional information after the limitations period [Mot. to Amend at 3, A-131; Reply Br. at 5-6, A-144-45];

- it attempted to set forth the $3 million in transfers to Brok [Mot. to Amend at 2, A-130; Reply Br. at 7-9, A-146-48];

- Brok had actual notice of the intended transfers [Mot. to Amend at 2-3, A-130-31; Reply Br. at 4-7, A-143-46];

- Delaware has adopted a liberal standard for allowing amendments to a complaint [Mot. to Amend at 3, A-131; Reply Br. at 2-3, A-141-42];

- Brok would not be prejudiced if the amendment were allowed [Mot. to Amend at 3-4, A-131-32; Reply Br. at 4, A-143];

- the cases cited by Brok in the answering brief, particularly *Peltz v. CTC Direct, Inc. (In re MBC Greenhouse Co.)*, 307 B.R. 787 (Bankr. D. Del. 2004), are inapposite and distinguishable [Reply Br. at 9-11, A-148-50];

- it would be inequitable not to allow the amendment [Reply Br. at 12-13, A-151-52].

Without oral argument, visiting Judge Lindsey issued his Memorandum and Order Denying Motion of Plaintiff for Leave to File an Amended Complaint ("Memorandum and Order" or "Opinion") on January 19, 2006. [Bankr. D.I. No. 35]. The Opinion is attached as Exhibit M to the Appendix at A-160. The lower court's Opinion contains errors, mandating reversal.

## SUMMARY OF ARGUMENT

1.    The Bankruptcy Court abused its discretion in not considering whether Rouge "attempted to set forth" in the original pleading the approximately $3 million in transfers to Brok.  Judge Lindsey misapplied the standard of relation back of amendments pursuant to Rule 15(c).

2.    Denying the Motion to Amend was an abuse of discretion because the Bankruptcy Court relied on factually and legally distinguishable case law and misapplied the undisputed facts of the case.  In ruling that an amendment would be futile, Judge Lindsey relied largely on cases in which the plaintiff filed a preference case on the eve of the running of the two-year statute of limitations, subsequently learned in discovery of additional possible preferential transfers, and then, for the first time, sought to raise those claims.  The evidence provided to the lower court shows that Brok had actual notice of the precise transfers at issue, Rouge attempted to attach a list of transfers referencing an account Rouge had with Brok, and due to a clerical error, Rouge mistakenly attached a list of transfers pursuant to an account with Fort Wayne.  The fact that it was a clerical error that caused Rouge to miss the limitations period by a mere twelve days is significant.  The lower court's failure to consider the affect of a clerical mistake and allow relation back is an abuse of discretion.

3.    The lower court erred in not finding that the nature of Rouge's clerical error makes the Complaint analogous to a complaint failing to meet the heightened pleading standard established by some courts for preference cases, but for which amendment is freely permitted.  Rouge did not set forth details of <u>any</u> transfers that were paid to Brok, the named-defendant in the Complaint.  Like other cases that failed to state a claim under this heightened pleading standard, Rouge should have been permitted leave to amend and have that amendment

9

relate back to the date of the original Brok Complaint. It was an abuse of discretion for the Bankruptcy Court not to allow Rouge to amend the Complaint because equity dictates that Rouge be allowed to amend.

10

## ARGUMENT

I.      **On Appeal, the Denial of a Motion to Amend Is Reviewed for Abuse of Discretion**

The denial of a motion to amend a complaint is reviewed for abuse of discretion when appealed.  *See Krantz v. Prudential Invs. Fund Mgmt. LLC,* 305 F.3d 140, 144 (3d Cir. 2002); *Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir. 2000); *Michener v. Brady (In re Brady),* 243 B.R. 253, 260 (E.D. Pa. 2000) (citing *U.S. v. Roberson,* 180 B.R. 364 (D.Md. 1995)).  An abuse of discretion shall be found where (1) the decision was based on an erroneous conclusion of law; (2) the record contains no evidence on which the bankruptcy judge could have based his decision; or (3) the supposed facts as found are clearly erroneous.  *In re Walls & All*, 127 B.R. 115, 117 (E. D. Pa. 1991).  The Memorandum and Order should be analyzed for an abuse of discretion.

II.     **The Bankruptcy Court Committed an Abuse of Discretion because, on the Undisputed Facts, the Amendment Should Relate Back and therefore Is Not Futile**

A.      **The Bankruptcy Court's Decision Was Based on an Erroneous Application of Rule 15(c)(2)**

The applicable standard guiding the Bankruptcy Court's decision is Rule 15(c)(2). The lower court correctly held that, "in order for Plaintiff to add the new transfers not contained in the Complaint, those transfers must relate back to the Original Complaint, otherwise the amendment would be futile." Op. at 4, A-163.  However, Judge Lindsey erred in holding that Rouge's motion "to amend its Complaint to add a completely different set of alleged transfers totaling approximately $3,000,000.00... after the statute of limitations" is futile because "in order for Plaintiff to add the new transfers not contained in the Complaint... those transfers must have arisen out of the same conduct, transactions, or occurrence set forth in the Original

11

Complaint." *Id.* (emphasis added). Judge Lindsey erred in failing to consider whether Rouge <u>attempted to set forth</u> the excluded $3 million in transfers, as required by Rule 15(c)(2).

Federal Rule of Civil Procedure 15, made applicable to the Adversary Proceeding by Federal Bankruptcy Rule of Procedure 7015, provides that leave to amend a complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The purpose of the liberal amendment policy is to allow cases to be decided on their merits rather than on technicalities. *Foman v. Davis*, 371 U.S. 178, 181 (1962). "[T]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome" of the case. *Id.* A court will grant leave to amend in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment and futility of amendment." *Id.* at 182.[1]

Further, Rule 15(c)(2) is to be liberally construed to satisfy the purposes of these rules of merit over technicality. *See Mackensworth v. S.S. American Merchant*, 28 F.3d 246, 251 (2nd Cir. 1994); *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1299 (5th Cir. 1971); *I.L.G.W.U. Nat'l Retirement Fund v. Meredith Grey, Inc.*, 190 F.R.D. 324, 328 (S.D.N.Y. 1999); *Malloy v. Mulkey Tire, Inc.*, 279 B.R. 297, 303, 307 (Bankr. N.D. Okla. 2002). "[W]e think that the "attempt" language of Rule 15(c) was intended to allow

---

[1] Brok did not contend below, and the Bankruptcy Court did not hold, that Rouge had acted with undue delay, in bad faith or dilatory motive. Nor did Brok allege below, and the Bankruptcy Court did not hold, that Rouge had failed to cure deficiencies in the Complaint by previous amendment. Finally, Brok did not assert below, and the Bankruptcy Court did not hold, that allowance of the amendment would unduly prejudice Brok in the Adversary Proceeding. In fact, the sole basis claimed by Brok for denying Rouge the right to amend was that the amendment would be futile because Rouge's proposed amendment does not relate back to the date of the original complaint and is, therefore, time-barred pursuant to 11 U.S.C. § 546(a), the two year statute of limitations for claims under 11 U.S.C. § 547.

12

corrections where the details of allegations in the pleadings are inaccurately set forth." *O'Loughlin v. National Railroad Passenger Corporation*, 928 F.2d 24, 27 n.6 (1st Cir. 1991).

Contrary to the lower court's recitation of the applicable law, the complete version of Rule 15(c) states that a proposed amendment will be deemed to relate back to the original pleading when:

> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transactions, or occurrence set forth <u>or attempted to be set forth</u> in the original pleading… .

(Emphasis added). Despite the clear language of the rule, Judge Lindsey erroneously held that "in order for Plaintiff to amend the Complaint to include the $3,000,000.00 set of transfers, those transfers must have arisen out [sic] [of] the same conduct, transactions, or occurrence set forth in the Original Complaint." Op. at 4, A-163. Judge Lindsey erred in failing to consider that Plaintiff <u>attempted to set forth</u> the $3,000,000.00 in transfers, and but for a clerical error, such transfers would have been attached as Exhibit A to the Complaint. Rouge's clerical error in attaching the wrong exhibit to the Complaint is a mere technical deficiency, and is precisely the type of error that Rule 15(c) is designed to correct.

**B.    The Bankruptcy Court Erred in Applying the Undisputed Facts to the Law**

       **(i)    Judge Lindsey should have considered that the Complaint and extrinsic facts provided notice that Rouge sought to avoid the Brok Transfers.**

"The rationale of *Rule 15(c)* focuses on the notice given by the general fact situation stated in the original pleading." *Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*, 327 B.R. 711, 716 (Bankr. D. Del. 2005) (internal quotation omitted). An original pleading that gives fair notice of the fact situation out of which the claim arises will prevent the defendant from being deprived of the protections a statute of limitations is

13

designed to provide. *See Senger v. Soo Line Railroad Co.*, 493 F. Supp. 143, 145 (D. Minn. 1980).

In considering whether to grant a motion to amend "the best approach is that which takes an over-all view of the problem." *Taylor v. Reading Company, Inc.*, 23 F.R.D. 186, 190 (E.D. Pa. 1958); *see also In re Del-Met Corp.*, 322 B.R. 781, 795 (Bankr. M.D. Tenn. 2005) (stating that a non-mechanical approach to analyzing relation back under 15(c)(2) is best especially in cases pursuant to section 546 where recovery for all creditors may be affected); *Green v. Walsh*, 21 F.R.D. 15, 19-20 (E.D. Wis. 1957) (stating the court should take an overall view in applying relation back rather than a technical view). Amendments that correct technical deficiencies or expand or modify the facts alleged in a prior pleading will meet the Rule 15(c) requirements and relate back. *See Keitt v. John Doe*, 1994 U.S. Dist. LEXIS 10026, at *7-8 (E.D. Pa. July 25, 1994).

Courts consider the original pleading and surrounding circumstances in determining whether notice has been provided. *See O'Loughlin*, 928 F.2d at 27 (stating that original pleading and extrinsic facts known to both parties would be considered in determining notice); *Soo Line R.R. Co.*, 493 F. Supp. at 15 (stating that "notice received from outside the pleadings is sufficient since the opposing party prepares a case based on all forms of notification."). This broad view of notice has been set forth in treatises on federal procedure:

> [I]t is sufficient if the opposing party was made aware of matters to be raised in the amendment from sources other than the pleadings, a position that seems sound since it is unwise to place undue emphasis on the particular way in which notice is received. An approach that better reflects the liberal policy of Rule 15(c) is whether the adverse party, viewed as a reasonably prudent person, ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question.

Wright & Miller, 6A FEDERAL PRACTICE & PROCEDURE §1497 (Rev. 2005).

In this case, the lower court failed to consider the undisputed facts and circumstances that established an attempt by Rouge to set forth the Transfers for approximately $3 million. Judge Lindsey did not consider that: (1) Brok was clearly on notice of the precise details of the $3 million in Transfers; (2) Rouge sued Brok, the payee of the $3 million in Transfers, and not Fort Wayne, the payee associated with the $70,000 in transfers; and (3) the docket reflects Rouge's demand of $3 million, not $70,000.

Under the unique factual circumstances of this case, Brok had actual and sufficient notice that Rouge was <u>attempting</u> to assert claims against Brok for $3 million. The undisputed facts reveal that in November 2004, almost one year prior to the running of the statute of limitations, Rouge specifically identified each of the approximately 400 transactions, totaling $2,903,343.83. A suit was thereafter filed against Brok for the same $2,903,343.83; however, due only to a clerical mistake, the wrong exhibit was attached to the Complaint. Rouge attempted to sue for approximately $3 million in transfers and Brok had notice of Rouge's intended claims. Denying the amendment flies in the face of not only Rule 15 of the Federal Rules of Civil Procedure, but a central principle of federal civil jurisprudence—to try claims on their merits. The Bankruptcy Court erred in failing to consider that the Complaint and surrounding circumstances provided Brok with adequate notice of this $3 million claim, warranting an amendment which relates back to the original pleading. Failure to apply the specific facts of this case to the correct legal standard is an abuse of discretion.

   **(ii)  Judge Lindsey should have considered that the Complaint alone provided notice that Rouge sought to avoid the Brok Transfers.**

   The Bankruptcy Court abused its discretion in holding that the language of the Complaint was not broad enough in scope to capture all of the Transfers made to Brok. Judge Lindsey found, without analysis, that "it can hardly be said that such language" in the Complaint—which states: "Plaintiff transferred property to or for [Brok]…, in at least the respective amounts and on the dates set forth on Exhibit A," Compl. ¶ 7, A-87—"would or should indicate to Defendant that Plaintiff's prayer was to avoid all transfers made during the preference period." Op. at 7, A-166. The evidence presented below reveals a clear and contrary picture. Brok was made aware that Rouge intended to avoid <u>all transfers</u> from Rouge to Brok during the Preference Period. Thus, the conclusion with no analysis, that "the Complaint was not <u>intended</u> to recover all potentially preferential transfers within the preference period," *id.* (emphasis added), is an abuse of discretion.

   Cases have held that notice similar to that received by Brok satisfies the requirements of Rule 15(c)(2). In *Global Link*, the plaintiff debtor filed a complaint on the last day prior to the expiration of the statute of limitations alleging $1,038,120.01 in preferential transfers and an indeterminate amount of fraudulent transfers. *Global Link*, 327 B.R. at 714. In response to the defendant's motion to dismiss, plaintiff filed an amended complaint attaching a list of additional fraudulent transfers totaling $2,010,493.61, after the statute of limitations had run. *Id.* at 716. The original complaint, in the fraudulent transfer count, stated "Prior to the Petition Date, the Debtors made transfers to the Transferee (collectively with the transfers listed above, referred to as the 'Transfers')." *Id.* at 717. The *Global Link* court held that this language was sufficient to put the defendant on notice that the fraudulent transfer claim may include

16

transfers other than those specified in the preference claim and allowed the additional $2,010,493.61 to relate back.

Similar to *Global Link,* the Complaint in this action gave notice that Rouge was seeking to recover preferential transfers made to Brok within the ninety days prior to the Petition Date in "at least" the amount listed in the exhibit. Compl. ¶ 7, A-87. Exhibit A did not list the transfers made to Brok, the party named in the Complaint. Rather, Exhibit A inadvertently identified transfers to Fort Wayne. Brok knew this to be the case, because prior to the filing Rouge had expressly put Brok on notice of the precise claims it would bring in a preference complaint. Under these facts, Brok "ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." Wright & Miller, 6A FEDERAL PRACTICE & PROCEDURE § 1497 (Rev. 2005). It was an abuse of discretion for Judge Lindsey to hold that it was not Rouge's intention to avoid all transfers made to Brok within the Preference Period. *See* Op. at 7, A-166.

### C.    The Bankruptcy Court Committed an Abuse of Discretion by Relying on Cases in the Memorandum and Order that Are Factually Distinguishable and Did Not Include Clerical Errors

#### (i)    The cases on which the Bankruptcy Court relied are inapposite.

The Bankruptcy Court relied primarily on *Peltz v. CTC Direct, Inc. (In re MBC Greenhouse Co.)*, 307 B.R. 787 (Bankr. D. Del. 2004), the facts of which Judge Lindsey concluded are "similar to the facts of the instant proceeding." Op. at 5, A-164. The lower court's reliance on *MBC Greenhouse* is erroneous because the facts of that case are clearly distinguishable. In *MBC Greenhouse*, decided by Judge Walsh, the plaintiff filed a complaint on the eve of the expiration of the two year statute of limitations. *Id.* at 789. After the running of

17

the statute, plaintiff discovered additional transfers made to the defendant that should have been included in the complaint.[2]  Following briefing on a motion to amend, Judge Walsh (1) held that "the Plaintiff has not produced any evidence to suggest that the Defendants had notice that the new transactions were subject to recovery," and (2) observed that "the motion is silent on how it is that the Plaintiff discovered the additional transactions which it now seeks to assert.  It appears that the plaintiff may simply have performed an inadequate examination of the Debtors' records leading up to the filing of the preference action on the eve of the statute of limitations." *Id.* at 793.

Unlike in *MBC Greenhouse*, the defendant here had notice more than a year before the statute of limitations expired that the $3,000,000 claim was subject to recovery, and when the Complaint was filed (eleven weeks before the statute ran) the docket notice states a demand of $3 million.  There were no newly discovered facts, and there was not a question of an inadequate examination of the Debtors' records.  Brok was sued for $3 million.  Fort Wayne was not sued.  The Brok Complaint mistakenly contained the Fort Wayne Exhibit.  The lower court erred in failing to distinguish *MBC Greenhouse*.

For the same reasons that *MBC Greenhouse* is distinguishable, other cases on which Judge Lindsey relied in the Memorandum and Opinion are not instructive.  For instance, Judge Lindsey cited *New Bedford Capacitor, Inc. v. Sexton Can Company, Inc. (In re New Bedford Capacitor, Inc.)*, 301 B.R. 375 (Bankr. D. Mass. 2003), *Coan v. O & G Industries, Inc. (In re Austin Driveway Services, Inc.)*, 179 B.R. 390 (Bankr. D. Conn., 1995), and *Gordon v. Slaughter (In re Slaughter Co. & Associates, Inc.)*, 242 B.R. 97 (Bankr. N.D. Ga. 1999) for the proposition that, without a unifying scheme or course of conduct, each preferential transfer

---

[2]    The initial complaint included six transactions totaling $2,830,141.32.  The proposed amendment identified 39 transactions totaling $7,911,935.66.  *Id.* at 792.

18

should be viewed as a distinct transaction. Such general rule is of no moment here, and has little application to the facts at issue. Contrary to the undisputed facts on appeal, the *New Bedford* case, the *Coan* case, and the *Gordon* case each dealt with a debtor that neglected to allege additional transfers in the original complaint—not due to a clerical error, but because the additional transfers were identified in discovery. Here, Rouge is not attempting "to use the relation-back doctrine to bootstrap new transactions onto viable actions…", *Gordon*, 242 B.R. at 103, as quoted by Judge Lindsey in the conclusion of the Memorandum and Order. Op. at 7-8, A-166. The Bankruptcy Court erred and abused its discretion in relying on inapposite caselaw.

In sum, in ruling that the amendment would be futile, Judge Lindsey relied largely on cases in which the plaintiff filed a preference case on the eve of the running of the two-year statute of limitations, subsequently learned in discovery of additional possible preferential transfers, and then, for the first time, sought to raise those claims. Unlike the cases relied upon by Judge Lindsey, where the plaintiff could not argue that it "attempted to set forth" those transfers in the complaint, here Rouge clearly attempted to sue on the $3 million in Transfers previously identified in detail to the defendant. Rouge did not attempt to <u>add</u> transactions to the Brok Complaint. It was an abuse of discretion for Judge Lindsey to use dissimilar cases to determine that the Transfers do not relate back to the timely filing of the Complaint.

### (ii)     Judge Lindsey should have considered cases that address the impact of a clerical mistake.

Courts have held that the nature of the mistake will influence the outcome of a motion to amend pleadings or reform documents. *See Huber Oil of Louisiana, Inc. v. State of Louisiana (In re Huber Oil of Louisiana)*, 311 B.R. 440 (Bankr. W.D. LA); *Little v. United States*, 317 F. Supp. 8 (E.D. Pa. 1970). A clerical error is distinguishable from any other type of

19

error. *See Huber Oil*, 311 B.R. at 444 (Bankr. W.D. LA). "Clerical error" is defined in Black's

Law Dictionary, and as cited in *Huber Oil*, as:

> [a]n error resulting from a minor mistake or inadvertence, esp. in
> writing or copying something on the record, and not from judicial
> reasoning or determination. Among the boundless examples of
> clerical errors are omitting an appendix from a document; typing an
> incorrect number; mis-transcribing a word; and failing to log a call.
> <u>A court can correct a clerical error at any time, even after judgment
> has been entered.</u>

*Id.* (emphasis added). The issue in *Huber Oil* was whether certain property was transferred in

mortgage documents. Based on "[t]he entire record of this proceeding," the bankruptcy court

applied Black's definition and concluded that the transferor/plaintiff intended the

defendant/transferee to receive the "omitted property," but for an error "occurring in the physical

preparation of the documents and that no reasoning or thought process was involved." *Id.*

(differentiating between "error" and "clerical error" in applying a Louisiana statute that allows

for corrections based on a clerical errors). As a result, the bankruptcy court in *Huber Oil* deemed

the amendment retroactive to the date the documents originally were filed. *Id.* at 445.

Similarly, in *Little*, the plaintiff filed a complaint under the Federal Tort Claims

Act for personal injury. The Federal Tort Claims Act provides that a claim pursuant to the Act

cannot exceed the amount of the claim presented to the federal agency. 317 F. Supp. at 9. The

*Little* plaintiff had submitted a letter to the federal agency setting forth damages of $8,500, prior

to filing her complaint. *See id.* The federal agency then sent a Standard Form 95 for the plaintiff

to fill out and state the total amount that the plaintiff agrees to accept from the agency to

conclude the matter. *See id.* While completing the form, the *Little* plaintiff mistakenly only set

forth her medical costs of about $1,390, not her entire claim for damages. *See id.* In the

complaint, the *Little* plaintiff sought to recover the full $8,500 amount of her damages. The

20

*Little* court, in ruling on whether the plaintiff was limited in her claim for damages to what was written in the form, stated:

> [T]he unique legal issue in this case is where the government knows a mistake has been made and where the government had precise prior notice of the true demand, does the statute require the Government to be the unintended beneficiary of patent clerical error. Such harshness is not required by the most perceptive decisions.

*Id.*

Even though the decisions in *Huber Oil* and *Little* are not interpreting Rule 15(c)(2), the cases are instructive in showing the unique nature of clerical errors and applicable remedies. Here, the attachment of the set of transfers referring to Fort Wayne, rather than Brok, was unintended, and amounts to a clerical error meriting special consideration. The mistake occurred in the physical preparation of the documents for filing, and was not the result of any reasoning, determination, or thought process. The entire record, including the pleadings and the correspondence between the parties, evidences Rouge's intention to sue Brok for approximately $3 million in transfers. But for the clerical error, there is no rational explanation for the attachment to the Brok Complaint of $70,000 in transfers to Fort Wayne. Moreover, as in *Little,* the defendant was on notice of the true demand and should not be "the unintended beneficiary of a patent clerical error." *Id.*

The Bankruptcy Court erred in failing to consider that the clerical mistake warranted leave to amend and that such amendment relates back to the original filing of the Complaint.

21

**III.**      **Alternatively, The Bankruptcy Court Abused its Discretion in not Considering the Equities of the Case and not Allowing Rouge to Amend the Complaint**

Rouge attempted to comply with the "heightened pleading standard" for setting forth a preference claim and should not be severely prejudiced by that attempt. Delaware cases dealing with the "heightened pleading standard" for preference actions are instructive and suggest that Rouge's Motion should have been granted.

The "heightened pleading standard" for preference cases was articulated by Judge Walsh in the *Valley Media* case:

> the following information must be included in a complaint to avoid preferential transfers in order to survive a motion to dismiss: (a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/ transferor, (iii) name of transferee and (iv) the amount of the transfer.

*Valley Media v. Borders (In re: Valley Media)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) .

While recent case law suggests that the heightened pleading standard is not required, *see IT Litigation Trust v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, at *51-53 (D. Del. Nov. 15, 2005) (rejecting the heightened pleading standard), *Estate of the IT Group, Inc. v. Brandywine Apartments (In re The IT Group, Inc.)*, 313 B.R. 370, 372-73 (Bankr. D. Del. 2004) (J. Lindsey), Rouge nevertheless attempted to comply with that standard by attaching a detailed exhibit to the Complaint. The simple fact is that an error was made and the wrong Exhibit A was attached. If Judge Lindsey's decision is allowed to stand, Rouge's attempted compliance with the heightened pleading standard will "cut off valid claims prematurely." *Neilson v. Southern (In re Webvan Group, Inc.)*, 2004 Bankr. LEXIS 269, at *7 (Bankr. D. Del. March 9, 2004) (disagreeing with the heightened pleading standard because, in part, valid claims could be cut

off); *Randall's Island Family Golf Centers, Inc. v. Acushnet Co. and Fortune Brands, Inc.)*, 290

B.R. 55, 65 (Bankr. S.D.N.Y. 2003) (same).

      If Rouge had not attempted to satisfy the heightened pleading requirement and

had instead omitted an exhibit altogether, the Complaint, at worst, would have been dismissed

subject to Rouge being given the opportunity to file an amended complaint. *See, e.g., TWA Inc.*

*v. Marsh USA Inc. (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 228 (Bankr. D. Del.

2004) (granting motion to dismiss since complaint did not meet the heightened standard but

allowing plaintiff to file an amended complaint that would relate back); *Valley Media,* 288 B.R.

at 192-93 (Bankr. D. Del., 2003); *Posman v. Bankers Trust Co., (In re Lomas Financial Corp.)*,

1999 WL 33742299, at *3 (Bankr. D. Del. July 28, 1999); *see also IDHG Litigation Trust v.*

*Westaff (USA), Inc. (In re Imperial Home Decor Group, Inc.)*, 2005 Bankr. LEXIS 264, at *2

(Bankr. D. Del. Feb. 24, 2005) (first complaint dismissed for failure to state a claim upon which

relief can be granted and plaintiff given 30 days to amend); *Pardo v. Gonzaba (In re APF Co.)*,

308 B.R. 183, 189 (Bankr. D. Del. 2004).

      Like other plaintiffs failing to meet the heightened pleading standard, Rouge

should have been given leave to amend the Complaint and such amendment should relate back.

For example, in *TWA,* the court dismissed a complaint that sought to avoid and recover allegedly

preferential transfers in the amount of "approximately two million dollars." 305 B.R. at 234.

The *TWA* court held that this allegation was not sufficient to meet the pleading requirements for

a preference claim and dismissed the complaint.  However, the court also granted leave to amend

the complaint to state the same allegations that had been set forth in the demand letter sent to the

defendant prior to the filing of the complaint. *Id.*  The defendant challenged the ability of such an

amendment to relate back because the statute of limitations had already passed, and the *TWA*

court responded that "I find no merit to Defendants' argument. Defendants have already been put on notice of the essential issues involved and they are surely fully informed regarding their business dealings with TWA." *Id.* at 233.

Similarly, in *Valley Media,* the plaintiff stated the total amount of the preference transfers but failed to provide any information meeting the heightened pleading standard. 288 B.R. at 192-93. The court dismissed the complaint, but allowed the defendant to amend to detail the transactions at issue and that amendment related back to the date of the original complaint. *See id.* In *Pardo*, the plaintiff alleged only the statutory language and failed to set forth any information regarding the preferential transfers. 308 B.R. at 189. The complaint was dismissed and the trustee was given thirty days to amend. *See id.* at 189*; Posman,* 1999 WL 33742299, at *3; *IDHG Litigation Trust,* 2005 Bankr. LEXIS 264, at *2.

Unlike the cases cited in the Memorandum and Order, where parties omitted transfers or failed to investigate, Rouge simply had a technical failure in attaching the wrong exhibit. Rouge is not attempting to bootstrap new transactions onto viable actions. The amendment sought to provide the detail of the transactions previously known to Brok, which transactions were the intended basis for the suit in the action below.

Judge Lindsey erred in failing to consider that it would be inequitable to prejudice Rouge for attempting to comply with the heightened pleading requirement.

24

## CONCLUSION

The Bankruptcy Court committed a reversible error by applying the wrong standard and failing to consider the impact of an obvious clerical error. Further, the lower court should have considered the undisputed notice the defendant had of Rouge's attempt to sue for $3 million. This Court should reverse the Bankruptcy Court's denial of Rouge's Motion to Amend the Complaint, determining that under Rule 15(c)(2), Rouge attempted to set forth approximately $3 million in transfers in the Complaint. Rouge's proposed amended complaint should be deemed to relate back to the original pleading.

Date: March 9, 2007

**LANDIS RATH & COBB LLP**

Daniel B. Rath (No. 3022)
Rebecca L. Butcher (No. 3816)
James S. Green Jr. (No. 4406)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel to the Appellant
Rouge Steel Company

528.001-15795.DOC

## CERTIFICATE OF SERVICE

I, James S. Green, Jr., hereby certify that on this 9th day of March, 2007, I caused a true and correct copy of the *Opening Brief in Support of Rouge Steel Company's Appeal and Appendix to Opening Brief in Support of Rouge Steel Company's Appeal* to be served on the following parties in the manner as indicated:

*Via Hand Delivery*
David M. Fournier, Esquire
James C. Carignan, Esquire
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801

*Via Federal Express*
Thomas P. Yoder, Esquire
Anne E. Simerman, Esquire
Barrett & McNagny LLP
215 East Berry Street
P.O. Box 2263
Fort Wayne, IN  46801-2263

James S. Green, Jr. (No. 4406)

1 of 1 DOCUMENT



Analysis
As of: Feb 27, 2007

**In Re: IMPERIAL HOME DECOR GROUP, INC., et al., Debtors. IHDG LITIGATION TRUST, Plaintiff, v. WESTAFF (USA), INC., Defendant.**

**Chapter 11, Case No. 00-19 (WS), Adversary Proceeding No. 02-1115 (WS)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2005 Bankr. LEXIS 264; 53 Collier Bankr. Cas. 2d (MB) 1630; 44 Bankr. Ct. Dec. 82*

**February 24, 2005, Decided**

**DISPOSITION:** Motion to dismiss second amended complaint was denied.

**COUNSEL:** [*1] For THE IMPERIAL HOME DECOR GROUP, INC., Debtor: Daniel J. DeFranceschi, Mark D. Collins, Michael Joseph Merchant, Richards Layton & Finger, P.A., Wilmington, DE.

Don A. Beskrone, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

**JUDGES:** Honorable Walter Shapero, United States Bankruptcy Judge.

**OPINION BY:** Walter Shapero

**OPINION:**

**MEMORANDUM OPINION DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT** n1

> n1 This Memorandum Opinion constitutes the Court's findings of fact and opinions of law pursuant to *Federal Rule of Bankruptcy Procedure 7052.*

Upon consideration of Defendant's Motion to Dismiss the Second Amended Complaint Filed in this Adversary Proceeding for Failure to State a Claim (Docket Nos. 63, 64 and 68); Plaintiff's Response thereto (Docket No. 65); and after due deliberation; the Court concludes that the motion is denied.

On October 19, 2004, Plaintiff IHDG Litigation Trust filed its Second Amended Complaint to Avoid Preferential Transfers and Recover Property [*2] (Docket No. 60) after the Amended Complaint was dismissed for failure to state a claim upon which relief can be granted (Docket No. 58). Judge Walrath's Dismissal Order allowed Plaintiff thirty days to amend, requiring Plaintiff to clarify: "(1) the name of the debtor to whom each Westaff invoice was sent, (2) the amount of each Westaff invoice, and (3) the name of the debtor who made each transfer." The Second Amended Complaint was timely filed and unambiguously complies with Judge Walrath's Order. Exhibit A to the Second Amended Complaint clearly lists: the name of the specific debtor making transfer, the date of each check, the check number, the check amount, the name of the debtor on each invoice, the invoice number, the invoice amount and the invoice date. The substance of Judge Walrath's Order carries with it a strong implication that if Plaintiff included the required additional information in a further amended complaint, that complaint would survive a dismissal motion.

Regardless, the Second Amended Complaint complies with the heightened pleading standard cited by Defendant. *See TWA Inc. Post Comfirmation Estate v. Marsh USA Inc. (In re TWA Inc. Post Confirmation Estate), 305 B.R. 228, 2004 WL 180421, at *1 (Bankr. D. Del. Jan. 20, 2004);* [*3] *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.), 288 B.R. 189, 192 (Bankr.*

*D. Del. 2003)*; *Posman v. Bankers Trust Co.*, Adv. Pro. No. 97-245 (Bankr. D. Del. July 29, 1999). Under that standard, complaints to avoid preferential transfers must provide: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *Valley Media, 288 B.R. at 192* (citation omitted). Defendant asserts that the Second Amended Complaint fails to provide the "nature" of the alleged preferential transfers because it is not clear what Defendant did to or for Plaintiff. Defendant's interpretation of "nature" misconstrues *Valley Media's* heightened pleading standard. Information regarding the "nature" of each antecedent debt need only detail whether the alleged transfer falls within the group of avoidable transfers delineated in *section 547*. See *11 U.S.C. § 547(b)*. The Second Amended Complaint clearly specifies the "nature" of the each antecedent debt [*4] by stating: "Within ninety (90) days before the Petition Date, the Defendant received payments totaling at least $ 19,010.29 (the "Payments") from the Debtors as set forth on Exhibit A hereto." This allegation states the "nature" of the antecedent debt by following the language of *section 547(b)(4)(A)*. n2 Exhibit A then identifies the amount, date, name of debtor/transferor, name of transferee and the amount of the transfer regarding each antecedent debt. The Second Amended Complaint therefore meets the heightened pleading standard for complaints to avoid preferential transfers. If Defendant interprets the "nature" requirement as requiring a description of the goods or services that Defendant provided, that is neither a proper nor an appropriate interpretation of the heightened pleading standard. In effect, that argument means in the context of this case, that Plaintiff, on pain of dismissal, and in addition to what is provided in the Second Amended Complaint and the referred to exhibit, must repeat in the body of that pleading the very same facts that are self evident from the exhibit and Defendant's own invoices. To state that position is to deny its logic and strain past the breaking [*5] point the applicable pleading concepts in the federal procedural arena, even when applying the heightened pleading standard.

n2 Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code"), *11 U.S.C. § 101 et seq.*

Furthermore, there is a difference of opinion in this District as to whether or not that so-called heightened standard is the proper one. *Compare TWA, 305 B.R. 228, 2004 WL 180421, at *1, and Valley Media, 288 B.R. at 192, with Official Comm. of Unsecured Creditors of the IT Group v. Brandywine Apartments (In re IT Group, Inc.), 313 B.R. 370, 373 (Bankr. D. Del. 2004)*, and *Neilson v. Southern (In re Webvan Group, Inc.), 2004 Bankr. LEXIS 269, 2004 WL 483580, at *2 (Bankr. D. Del. March 9, 2004)*. It is altogether possible, if it was necessary for this Court to do so, that it might agree with the latter cases. However, that decision is not necessary case given the other grounds for the Court's conclusion.

For the reasons set forth above, the Defendant's Motion to Dismiss is DENIED. A separate order denying [*6] the motion shall enter.

Dated: February 24, 2005

Honorable Walter Shapero

United States Bankruptcy Judge

## ORDER DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT AND REQUIRING DEFENDANT TO FILE ANSWER

For the reasons set forth in the Court's Memorandum Opinion of this date, Defendant's Motion to Dismiss the Second Amended Complaint Filed in This Adversary for Failure to State a Claim (Docket No. 63) is **DENIED**.

Defendant shall file and serve its Answer to the Second Amended Complaint on or before March 7, 2005.

Dated: February 24, 2005

Honorable Walter Shapero

United States Bankruptcy Judge

cc: James E. Huggett, Esquire n1

n1 Counsel shall distribute a copy of this Opinion and Order to all interested parties and the parties listed on the attached Service List and file a Certificate of Service with the Court.

2 of 2 DOCUMENTS



Positive
As of: Mar 08, 2007

**IT GROUP INC., et al., Debtor. IT LITIGATION TRUST, Plaintiff, v. DANIEL A. D'ANIELLO, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, PHILIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, CHARLES W. SCHMIDT, JAMES DAVID WATKINS, ANTHONY J. DELUCA, HARRY J. SOOSE, THE CARLYLE GROUP, THE CARLYLE GROUP L.L.C., CARLYLE PARTNERS II, L.P., CARLYLE SBC PARTNERS, II, L.P., CARLYLE INTERNATIONAL PARTNERS II, L.P., CARLYLE INTERNATIONAL PARTNERS III, L.P., C/S INTERNATIONAL PARTNERS, CARLYLE INVESTMENT GROUP, L.P. CARLYLE-IT INTERNATIONAL PARTNERS, L.P., CARLYLE-IT INTERNATIONAL PARTNERS II, L.P., CARLYLE-IT PARTNERS L.P., and T.C. GROUP, L.L.C., Defendants.**

**Civil Action No. 04-1268-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 27869*

**November 15, 2005, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at *Fed. Ins. Co. v. D'Aniello, 2006 U.S. Dist. LEXIS 4463 (W.D. Pa., Feb. 6, 2006)*
Reconsideration denied by, Motion denied by *IT Group, Inc. v. D'Aniello, 2006 U.S. Dist. LEXIS 5035 (D. Del., Feb. 9, 2006)*

**PRIOR HISTORY:** [*1] Chapter 11. Case No. 02-10118 Jointly Administered.

**COUNSEL:** Jeffrey M. Schlerf, Thomas H. Kovach, Eric M. Sutty, The Bayard Firm, Wilmington, Delaware, for Plaintiff. Of Counsel: Richard S. Wayne, Thomas P. Glass, John M. Levy, Strauss & Troy, Cincinnati, Ohio; Mark D. Collins, Marcos A. Ramos, Richards, Layton & Finger, P.A., Wilmington, Delaware; Roger D. Anderson, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware.

Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, Delaware, for Defendants. Of Counsel: Thomas L. Patten, David A. Becker, Latham & Watkins, LLP, Washington, D.C.; Laurie B. Smilan, Latham & Watkins, LLP, Reston, Virginia; Charles A. De Monaco, Kimberly L. Haddox, Dickie McCamey & Chilcote, P.C., Pittsburgh, Pennsylvania; Mark A. Willard, Paul D. Steinman, F. Timothy Grieco, Eckert, Seamans, Cherin & Mellot, LLC, Pittsburgh, Pennsylvania.

**JUDGES:** JORDAN, District Judge.

**OPINION BY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM OPINION**

November 15, 2005
Wilmington, Delaware

Kent A. Jordan

**JORDAN, District Judge**

**I. INTRODUCTION**

Before me are Motions to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) and for [*2] Failure to State a Claim (D.I. 37) filed by defendants Daniel A. D'Aniello ("D'Aniello"), Francis J. Har-

vey ("Harvey"), James C. McGill ("McGill"), Richard
W. Pogue ("Pogue"), Phillip B. Dolan ("Dolan"), E. Mar-
tin Gibson ("Gibson"), Robert F. Pugliese ("Pugliese"),
Charles W. Schmidt ("Schmidt"), James David Watkins
("Watkins"), Anthony J. DeLuca ("DeLuca"), Harry J.
Soose ("Soose"), and the following parties (collectively
referred to as the "Carlyle Defendants"): The Carlyle
Group, The Carlyle Group, L.L.C., Carlyle Partners II,
L.P., Carlyle SBC Partners, II, L.P., Carlyle International
Partners II, L.P., Carlyle International Partners III, L.P.,
C/S International Partners, Carlyle Investment Group,
L.P., Carlyle-IT International Partners, L.P., Carlyle-IT
International Partners II, L.P., Carlyle-IT International Partners L.P.,
and T.C. Group, L.L.C. n1

> n1 All of the defendants are referred to col-
> lectively as the "Defendants."

The First Amended Complaint (D.I. 30, the "Com-
plaint"), filed by IT Litigation Trust ("Plaintiff") [*3]
alleges in Counts I-V n2 that Defendants, as directors,
officers, and controlling shareholders of the IT Group,
Inc. (the "IT Group" or the "Company"), breached their
corporate fiduciary duties, that their acts constituted
waste of corporate assets, and that the Carlyle Defen-
dants aided and abetted the other Defendants' breach of
fiduciary duties. (D.I. 30 at PP 58-79.) Plaintiff also al-
leges, in Counts VI-VIII, that payments made by the IT
Group to certain Defendants are avoidable preferences or
fraudulent transfers under the Bankruptcy Code and
Delaware state law. (Id. at PP 80-115.) Finally, Plaintiff
alleges in Count IX that the directors unlawfully paid
dividends to the Carlyle Defendants. (Id. at PP 116-18.)

> n2 The Complaint sets forth nine theories of
> recovery, which are denominated as "claims for
> relief and, for convenience, are herein designated
> as "Counts." Count I alleges that the IT Group di-
> rectors and officers breached their corporate fidu-
> ciary duties. Count II makes the same allegations
> against the directors and officers under the "Trust
> Fund" doctrine, explained *infra* note 8. Count III
> alleges that the directors and officers wasted cor-
> porate assets. Count IV alleges that the Carlyle
> Defendants breached their corporate fiduciary du-
> ties. Count V alleges that the Carlyle Defendants
> aided and abetted the breaches committed by the
> directors and officers. Count VI seeks, under the
> Bankruptcy Code, to avoid certain preferential
> transfers. Count VII alleges that payments made
> to the Carlyle Defendants were constructively
> fraudulent transfers. Count VIII alleges that pay-
> ments made to the Carlyle Defendants and certain
> individual defendants were actual fraudulent

transfers. Count IX alleges that dividends were
paid unlawfully to the Carlyle Defendants.

### [*4]

Defendants contend that the claims based exclu-
sively on Delaware state law, Counts I-V and IX, do not
fall within the subject matter jurisdiction of this court,
either under the statute providing for original jurisdiction
over bankruptcy cases, *28 U.S.C. § 1334*, or under that
providing for supplemental jurisdiction, *28 U.S.C. §
1367*. Defendants also contend that Counts I-VI and IX
must be dismissed in their entirety, and that Counts VII
and VIII must be dismissed in part, for failure to state a
claim upon which relief can be granted. For the reasons
that follow, I will deny Defendants' Motion to Dismiss
for Lack of Subject Matter Jurisdiction, and I will grant
in part and deny in part Defendants' Motion to Dismiss
for Failure to State a Claim.

### II. BACKGROUND n3

> n3 The following background information is
> drawn from the parties' submissions and does not
> constitute findings of fact.

A. The Carlyle Defendants' Investment in the IT
Group

The IT Group was [*5] a Delaware corporation with
its principal office in Monroevillie, Pennsylvania, which
provided services in "consulting, engineering, construc-
tion, environmental remediation, and facilities and waste
management." (Complaint, D.I. 30 at P 30.) These ser-
vices "included the identification of contaminants in soil,
air, and water, as well as the subsequent design and exe-
cution of remedial solutions." (*Id.*)

The Carlyle Group is a private merchant bank head-
quartered in Washington D.C. that invested in the IT
Group "through a number of entities that it owns or con-
trols." (*Id.* at P 14.) Specifically, in or around November
1996, the Carlyle Defendants collectively invested $ 45
million in the IT Group. (*Id.* at P 31.) That sum included
investments by several Cayman Islands limited partner-
ships, i.e., Carlyle International Partners II, L.P., Carlyle
International Partners III, L.P., C/S International Part-
ners, Carlyle-IT International Partners, L.P., and Carlyle-
IT International Partners II, L.P., made through their
general partner, T.C. Group, L.L.C. (*Id.* at PP 18-20, PP
22-23, P 31.) In return for the $ 45 million in invest-
ments, the Carlyle Defendants received 45,000 shares
[*6] of 6% Cumulative Convertible Participating Pre-
ferred Stock and detachable warrants to purchase 1.25
million shares of the IT Group's common stock. (*Id.* at P
31.)

"The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors ... ." (*Id.*) The IT Group Proxy Statement n4 dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (*Id.* at A-0025.) Those directors remained on the IT Group board through 2002. (Complaint, D.I. 30 at P 3, PP 7-9, P 11.)

> n4 In reviewing a *12(b)* motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See In re Delmarva Sec. Litig.*, *794 F. Supp. 1293, 1299 (D. Del. 1992)*.

[*7]

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected. (Complaint, D.I. 30 at P 4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the Carlyle Defendants. n5 (D.I. 39, Ex. D at A-0024.)

> n5 In addition to the election rights associated with their investment, "the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $ 100,000.00 per year and $ 10,000.00 per month." (Complaint, D.I. 30 at P 31.)

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello "has been a Managing Director of The Carlyle Group since at least 1987" and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, [*8] L.L.C. (*Id.* at P 3.) Dolan "has been employed by The Carlyle Group since at least 1989." (*Id.* at P 7.) "In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group." (*Id.*) Harvey, along with D'Aniello, served on the boards of directors of other companies that are owned or controlled by The Carlyle Group. (*Id.* at PP 3-4.) Finally, Watkins "served as director of Duratek,

Inc. of which the Carlyle Defendants are the majority shareholder." (*Id.* at P 11.)

Plaintiff alleges that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (*id.* at P 31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14).

### B. The Roll-Up Strategy

According to Plaintiff, "as of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money." (*Id.* at P 42.) The Carlyle Defendants, "through [their] control of the board of directors of the IT Group, adopted and implemented a purported 'Roll-Up Strategy' to grow the company by acquiring companies engaged in the same or similar lines of business. [*9] " (*Id.* at P 32.) From 1998 to 2000, the IT Group "acquired at least eleven companies" as part of this strategy. (*Id.*) In five of those acquisitions, the IT Group paid approximately $ 526 million and booked goodwill n6 of approximately $ 515.5 million. (*See id.* at PP 33-37.) In a sixth acquisition, the IT Group paid approximately $ 1 million, along with contingent consideration of up to $ 8 million, and booked goodwill of approximately $ 5.5 million. (*Id.* at P 38.) "By or about the end of 2000, the IT Group had booked aggregate [goodwill] of approximately $ 539 million, representing 41 percent of the IT Group's total assets." (*Id.* at P 39.) Plaintiff asserts that the goodwill booked in those transactions was "of no value to the IT Group," and that consequently, "the value of the IT Group's assets was substantially less than the values reflected on its books." (*Id.* at P 41.)

> n6 "Goodwill" is defined in the Complaint as the "Cost in excess of net assets of the acquired businesses." (Complaint, D.I. 30 at P 39.)

[*10]

### C. The IT Group's Insolvency

The Roll-Up acquisitions between 1998 and 2000 "were funded largely by debt financing ... including approximately $ 500 million in secured loans and credit facilities ... and approximately $ 255 million in subordinated bond debt issued in 1999." (*Id.* at P 43.) This financing "increased the Company's leverage, increased its interest payments, and strained [its] liquidity." (*Id.* at P 44.) To deal with this lack of liquidity, the IT Group obtained an additional $ 100 million term loan in March 2000. (*Id.* at P 45.) Its "average debt outstanding during 2000 was approximately $ 650 million." (*Id.*)

"In March 1997, the Company reported approximately $ 360 million in revenues and total liabilities of approximately $ 172 million ... ." (*Id.* at P 44.) "By De-

cember 2000, [it] reported approximately $ 1.4 billion in revenues, while total liabilities had ballooned to approximately $ 1 billion ... ." (*Id.*) "For the period ended [sic] March 28, 1997", the IT Group had a tangible net worth of approximately $ 160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $ 277 million. **[*11]** " (*Id.* at P 46.) Plaintiff alleges that, "beginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency." (*Id.* at P 47.)

Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id.* at P 57.) "Thereafter, the IT Group was liquidated." (*Id.*)

D. Allegations Regarding the Board's Actions and Failures to Act

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT Group directors and officers also "failed to take prompt and prudent actions to preserve and maximize [the IT Group's] assets and to restructure its debts" (*id.* at P 50), "failed to retain financial asset divestiture consultants, financial consultants, turnaround and restructuring consultants, or bankruptcy and legal counsel" (*id.* at P 51), and "failed to inform themselves of all material information available to them concerning financial restructuring" (*id.* at P 52). According to Plaintiff, those failures "caused or deepened [the IT Group's] insolvency, and sealed [its] financial doom." (*Id.* at P 55.) Because, Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (see **[*12]** *id.* at P 14, P 31), those failures are also the Carlyle Defendants' failures (*see id.* at P 1). In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors. (*Id.* at PP 58-75.) Count V alleges that the Carlyle Defendants also aided and abetted the other Defendants' breaches. (*Id.* at PP 76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle Defendants were paid in excess of $ 850,000 from consulting agreements with the Company and in excess of $ 8.9 million in dividends from their preferred stock in the Company. (*Id.* at P 1.) Plaintiff particularly describes dividend payments to the Carlyle Defendants of $ 1,362,254 in 1998 (*id.* at P 99), $ 2,765,700 in 1999 (*id.* at P 101), $ 2,765,700 in 2000 (*id.* at P 102), and $ 2,074,275 in 2001 (*id.* at P 103), all of which are alleged in Counts VII and VIII to be fraudulent transfers (*id.* at PP 97-115) and, in Count IX, to be unlawful payments of dividends (*id.* at PP 116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle **[*13]** Defendants, within the year before the bankruptcy petition (*id.* at PP 82-88) and which are alleged, in Count VI, to be avoidable pref-

erential transfers (*id.* at PP 80-96) and, in Count VIII, to be fraudulent transfers (*id.* at PP 109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id.* at P 61(g), P 65(g), P 69(f), P 74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to "artificially extend[] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at P 61(h), P 65(h), P 69(g), P 74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id.* at PP 76-79.)

The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at **[*14]** 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

## III. STANDARD OF REVIEW

A challenge to subject matter jurisdiction under *Fed. R. Civ. P. 12(b)(1)* requires a court to ask "whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction." *FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996).*

*Fed. R. Civ. P. 12(b)(6)* requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).* "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).*

A complaint **[*15]** must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a).* The Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim," *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*, and "a plaintiff will not be thrown out of court on a *Rule 12(b)(6)* motion for lack of detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 237 (3d Cir. 2005).* Still, a plaintiff must allege the supporting facts "necessary to provide the defendant fair notice of

the plaintiff's claim and the 'grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*.

## IV. DISCUSSION

A. The Motion Challenging Subject Matter Jurisdiction

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to *28 U.S.C. § 1334.* That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not [*16] exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases undertitle 11." *§ 1334(a), (b).* "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004).* It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of "related to" jurisdiction.

"With 'related to' jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate." *Id. at 163-64* (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under "related to" jurisdiction if "the outcome of that proceeding [*17] could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984).* But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because "at the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute." *Resorts, 372 F.3d at 165.* After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." *Id. at 166.* "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id. at 167.*

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D.I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff

to the beneficiaries of the Litigation Trust. Second, Defendants argue that [*18] resolving the state law claims requires no construction, interpretation, or implementation of the plan. (*Id.* at 11-12.) Rather, the only connection to the bankruptcy "is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries," and that connection, on its own, is insufficient to support "related to" jurisdiction. (*Id.* at 13 (citing *Resorts, 372 F.3d at 170*).) Thus, Defendants conclude, this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in *Resorts.* First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the "close nexus" test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the *Pacor* test would end the court's jurisdiction when the plan was confirmed. *Id. at 165-67.* Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in *Resorts,* which arose nearly seven years [*19] after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires." *Michaels v. World Color Press, Inc. (In re LGI, Inc.), 322 B.R. 95, 102 (Bankr. D.N.J. 2005).* While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding "plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters." *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff "any claims for acts or omissions of [the IT Group's] . . . present and former officers, directors, [*20] insiders and accountants." (D.I. 53 at A052.) The present claims are within that category, and their pursuit was therefore contemplated by the plan itself.

Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts. 372 F.3d at 166-67.* I therefore conclude that the state law claims

in Counts I-V and IX are properly within the "related to" jurisdiction granted under *§ 1334*. n7

> n7 Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under *28 U.S.C. § 1367*.

### B. The *12(b)(6)* Motion to Dismiss

1. Counts I, II, and IV - Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle Defendants

As earlier noted, *supra* note [*21] 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors. In Count II, Plaintiff makes the same allegations against the directors and officers under the "Trust Fund" doctrine, n8 based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts. Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims. I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

> n8 Under the Trust Fund doctrine, "the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." *Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 791 (Del. Ch. 2004)*.

[*22]

#### a. Duty of Loyalty

Two of the ten separate breaches alleged in each of Counts I, II, and IV are identifiable as breaches of the duty of loyalty. First, the Defendants allegedly made "transfers for the benefits [sic] of insiders." (Complaint, D.I. 30 at P61(g), P65(g), P74(g).) Second, the Defendants "artificially extended the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at P61(h), P65(h), P74(h).) These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt. I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

#### i. Directors

Under Delaware law, a director's duty of loyalty "imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Belcom, Inc. v. Robb, 1998 Del. Ch. LEXIS 58, No. CIV.A. 14663, 1998 WL 229527, at *3 (Del. Ch. 1998)* (citing *Guth v. Loft, 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)).* While each [*23] director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company," *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984),* n9 unless the plaintiff shows that the presumption does not apply. A plaintiff can avoid the presumption for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman, 794 A.2d 5, 23 (Del. Ch. 2002).* A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received by stockholders generally. See *Aronson, 473 A.2d at 812; Orman, 794 A.2d at 23.* "Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences." *Aronson, 473 A.2d at 816.* A lack of independence arises when "directors are 'beholden' to [the controlling [*24] person] or so under their influence that their discretion would be sterilized." *Orman, 794 A.2d at 24* (quoting *Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993)).*

> n9 While *Aronson* was a "classic Delaware derivative case," *Tower Air, 416 F.3d at 236 n.10*, citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id. at 238* (citing *Aronson* for definition of the business judgment rule).

Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id.* at PI, PP99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff [*25] appears to

allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were "beholden to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized." *Orman, 794 A.2d at 24.* For the allegations to survive this Motion, Plaintiff must allege the supporting facts "necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the 'grounds upon which it rests.'" *Tower Air, 416 F.3d at 237* (quoting *Conley, 355 U.S. at 47*).

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at PP3-4, P7, P11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five **[*26]** of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at P4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson, 473 A.2d at 816* ("It is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.") Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (Complaint, D.I. 30 at P31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while **[*27]** I seriously doubt that the conclusory allegations of control in the Complaint would survive a *12(b)(6)* motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under

Delaware law, *Tower Air, 416 F.3d at 236-39*, I am bound to hold that the Plaintiff's allegations are sufficient in this case. n10

n10 A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower Air, 416 F.3d at 236-37* & n.11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer, 380 U.S. 460, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)* (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.

**[*28]**

The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. Thus, "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1051 (Del. Ch. 1996).*

This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 64 (Del. 1989)* ("The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.") First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from "injecting themselves into a management role for which they were neither trained nor competent." *Weiss v. Temporary Inv. Fund, 692 F.2d 928, 941 (3d Cir. 1982).* Second, the business judgment rule protects "against a threat of suboptimal risk acceptance." *Gagliardi, 683 A.2d at 1052.* As a policy matter, directors should not be

overly risk averse. "Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital." *Id.* Imposing liability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

[*29]

To implement the business judgment rule, the substance of Delaware corporate law induces a presumption that, absent self-interest or lack of independence, "the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).* The plaintiff "may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and "in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the 'contested decision was not a product of valid business judgment." *In re General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1132 (D. Del. 1988)* (citing *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988); Aronson, 473 A.2d at 812*); *see also Crescent/Mach I Partners L.P. v. Turner, 846 A.2d 963, 984 (Del. Ch. 2000)* ("In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); *Ash v. McCall, 2000 Del. Ch. LEXIS 144, No. CIV.A.17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000)* ("This Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action ... .").

[*30]

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air, 416 F.3d at 236* ("The District Court (mistakenly) cited derivative suit pleading cases ... ."), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 457 & n.6 (D. Del. 2004)*, and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi, 2004 U.S. Dist. LEXIS 15664, No. CIV.A.01-403, 2004 WL 1812705, at *2 (D. Del. Aug. 6, 2004)*. In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air, 416 F.3d at 236-37* ("Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.") (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading "particularized" facts may be more stringent in a derivative action, governed by *Rule 23.1*, than in a direct action being challenged under *Rule 12(b)(6). Cf. Telxon Corp. v. Bogomolny, 792 A.2d 964, 974 (Del. Ch. 2001)* (stating that the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under *Rule 23.1* "is somewhat lower" under *Rule 12(b)(6)*). My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears "scant resemblance" to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

[*31]

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a *Rule 12(b)(6)* motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach

creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).* The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, "it would be puzzling if, in insolvency, the equitable law of corporations expanded the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions." *Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 794 (Del. Ch. 2004).*

[*32]

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, "generally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under *Rule 12(b)(6)*." *Tower Air, 416 F.3d at 238.* It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to "dummy-up" about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule "must plead that he overcomes the presumption created by that rule." *Id.* Since the standard to be applied is the notice pleading standard of *Federal Rule of Civil Procedure 8,* a pleading will not be insufficient for failure to include particularized facts. But it can be "self-defeating" by giving such facts, if they offer "an ostensibly legitimate business purpose for an allegedly egregious decision."*Id. at 239.* In short, because the Third Circuit sees a problem

not when facts are omitted but only when they are presented, *see id.* ("The problem ... is not the facts that are not pleaded, but the facts that are."), the predictable and unfortunate result will be deliberately obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

[*33]

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual directors. (Complaint, D.I. 30 at PP81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the "transfers to insiders" alleged in Counts I and II, the allegations concerning those payments are insufficient to meet [*34] even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (*See id.* at PP81-87, P92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to form the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially extending the life of the Company to continue making

those payments. Those two aspects of Counts I and II, as asserted against the directors, survive this Motion.

### ii. Officers

Counts [*35] I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges nothing about Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (*See id.* at P12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

### iii. Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, "only if [that shareholder] owns a majority [*36] interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.), 535 A.2d 1334, 1344 (Del. 1987)*. A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson, 473 A.2d at 812*. The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (*See* Complaint, D.I. 30 at P14, P31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested [*37] fiduciaries, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle

Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air*. The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim. n11

> n11 Count IV actually alleges that the directors and officers breached various fiduciary duties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle Defendants. (*See* Complaint, D.I. 30 at P74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat the Complaint as fairly making those allegations.

### b. Duty of Care

The remaining eight breaches alleged in Counts I, II, and IV are breaches [*38] of the duty of care. Plaintiff alleges that Defendants: first, "failed to inform themselves of all material information readily available to them," (Complaint, D.I. 30 at P61 (a), P65(a), P74(a)); second, "incurred Acquisitions for more than the fair value of such Acquisitions and increased the Company's debts through such Acquisitions," (*id.* at P61(b), P65(b), P74(b)); third, "deepened the Company's insolvency," (*id.* at P61(c), P165(c), P74(c)); fourth, "failed to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors." (*id.* at P61(d), P65(d), P74(d)); fifth, "knowingly or recklessly ignored facts of, [sic] the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized," (*id.* at P61(e), P65(e), P74(e)); sixth, "pursued a 'Roll-Up Strategy' long after they knew or should have known it was a failure," (*id.* at P61(f), P65(f), P74(f)); seventh, "failed to timely retain restructuring advisors in order to fully inform themselves of their duties and to take steps necessary and appropriate to maximize the value of the Company for its creditors," (*id.* at P61(1), P65(i), P74(1)); and [*39] eighth, "wasted corporate assets," (*id.* at P61(j), P65(j), P(74(j)). Again, the claims against the directors, the officers, and the Carlyle Defendants are discussed in turn.

### i. Directors

Directors must "inform themselves ... of all material information available to them [and] ... must then act with requisite care in the discharge of their duties." *Aronson, 473 A.2d at 812*. The duty of care claims n12 must be dismissed, however, because the IT Group's Certificate of Incorporation contains an exculpation provision that states:

A director of this Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such limitation of liability is prohibited by the Delaware General Corporation Law as the same exists or may hereafter be amended.

(D.I. 39 at A-0028.) This provision was adopted pursuant to *§ 102(b)(7)* of Delaware's General Corporation Law, *8 Del. Code § 102(b)(7)*, which provides:

The certificate of incorporation may ... contain ... (7) A provision eliminating or limiting the personal liability [*40] of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders: (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under *§ 174* of this title: or (iv) for any transaction from which the director derived an improper personal benefit.

The exculpatory provisions of *§ 102(b)(7)* apply to claims brought by creditors of an insolvent corporation. *Prod. Res. Group, L.L.C: v. NCT Group, Inc., 863 A.2d 772, 793-95 (Del. Ch. 2004)*. Once the *§ 102(b)(7)* provision is raised against duty of care claims, that is "the end of the case." *Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2001)*. n13

n12 To the extent that these allegations relate to the payments to insiders or to the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, Section IV.B.1.a. Read in the light most favorable to Plaintiff, the remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor decision-making concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.

[*41]

n13 The Third Circuit declined to address an exculpatory charter provision in *Tower Air*, because the provision was raised for the first time on appeal. *416 F.3d at 242*. The Delaware Supreme Court held in reviewing a *12(b)(6)* motion that, white a *§ 102(b)(7)* clause provides an affirmative defense, "proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based solely on alleged breaches of the board's duty of care." *Malpiede v. Townson, 780 A.2d 1075, 1095-96 n.71 (Del. 2001)*.

Thus, while the duty of loyalty claims are unaffected, the directors are protected by *§ 102(b)(7)* against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

ii. Officers

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were [*42] made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at P12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1 .b.i. n14

n14 Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

[*43]

iii. Carlyle Defendants

Case 1:06-cv-00250-GMS    Document 16-2    Filed 03/09/2007    Page 14 of 25

Page 12
2005 U.S. Dist. LEXIS 27869, *

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors. As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in the light most favorable to Plaintiff, concern poor decision-making about the Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt. Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV.B.1.a.iii. The remaining claims, therefore, center on the failed Roll-Up Strategy.

While the *§ 102(b)(7)* charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those [*44] alleged breaches, the Complaint fails to state a claim. Plaintiff is not required to plead detailed facts, but must still "plead around the business judgment rule." *Tower Air, 416 F.3d at 238.* Thus, even at the pleading stage, if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted. *Id. at 239.*

Here, Plaintiff alleges that the Roll-Up Strategy was implemented "to grow the company by acquiring companies engaged in the same or similar lines of business." (Complaint, D.I. 30 at P32.) Further, while the IT Group's debt increased during this time, the Roll-Up Strategy increased revenues from approximately $ 360 million in 1997 to approximately $ 1.4 billion in 2000. (*Id.* at P44.) While the strategy "did not provide the Company with the desired benefits," (*id.* at P48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is "self-defeating," *see Tower Air, 416 F.3d at 239* ("[A] complaint is self-defeating [*45] when it states an ostensibly legitimate business purpose for an allegedly egregious decision"), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

### 2. Count III - Waste of Corporate Assets

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of their fiduciary duties. (Complaint, D.I. 30 at P69(a)-(h).) For a transaction to amount to waste, it must be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998).*

#### a. Directors

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions [*46] involves payments made to some of the Defendants, including the Carlyle Defendants. Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the *§ 102(b)(7)* provision protects the directors from [*47] liability for those transactions. *See Green v. Phillips, 1996 Del. Ch. LEXIS 76, C.A. No. 14436, 1996 WL 342093, at *6-*7 (Del. Ch. June 19, 1996)*(holding that a *§ 102(b)(7)* provision protected directors from corporate waste claims based on transactions that did not "bring the directors' loyalty and good faith into question").

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at P69(f)-(g)) survive the Defendants' *12(b)(6)* motion, while the other claims of corporate waste (*id.* at P69(a)-(e), (h)) must be dismissed.

#### b. Officers

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii,

IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.2.a.

3. Count **[*48]** V - Aiding and Abetting Claim Against the Carlyle Defendants

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *Crescent/Mach I Partners, L.P. v. Turner, 846 A.2d 963, 989 (Del. Ch. 2000).* While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially extending the life of the IT Group to keep those payments going. Second, again as earlier discussed, Section IV.B.1.a.iii, the allegations of the Carlyle Defendants' **[*49]** actual control of the IT Group board are sufficient to survive the *12(b)(6)* motion, and knowing participation could be inferred from that alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach and the knowing participation in the breach by the Carlyle Defendants, and so Count V adequately alleges that the Carlyle Defendants aided and abetted the directors' breach of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges aiding and abetting of those supposed breaches, it too must be dismissed.

4. Count VI - Avoidance Claims Under *11 U.S.C. § 547*

In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey, Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid as preferential transfers pursuant to *11 U.S.C. §§547(b), 550.* The Complaint lists specific amounts transferred to the mentioned individual defendants and $ 2,076,000 transferred to the Carlyle Defendants. (D.I. 30 at PP82-

88.) The Complaint further alleges that the payments were made **[*50]** within one year of the bankruptcy petition date (*id.* at P81) to creditors (*id.* at P89) who are also insiders (*id.* at P90), that the payments were made on account of antecedent debt (*id.* at P92), were made while the IT Group was insolvent (*id.* at P93), and enabled the listed Defendants to receive more than they would in the circumstances set forth in *11 U.S.C. § 547(b)(5)* (*id.* at P94). Defendants argue that those allegations, which mostly mirror the statutory language in *§ 547(b)*, are insufficient and that Count VI must be dismissed.

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.), 305 B.R. 228, 232 (Bankr. D. Del. 2004),* and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media), 288 B.R. 189, 192 (Bankr. D. Del. 2003).* Those cases instruct that, "to survive a motion to dismiss," a complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the **[*51]** transfer." *TWA, 305 B.R. at 232; Valley Media, 288 B.R. at 192.* Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of *Federal Rule of Civil Procedure 8. See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.), 313 B.R. 370, 373 (Bankr. D. Del. 2004), Neilson v. Cor Karaffa (In re Webvan Group, Inc.), 2004 Bankr. LEXIS 270, Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr. D. Del. Mar. 9, 2004).* It has been rightly observed that, "while plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them **[*52]** to do so in their initial pleading in all cases . . . [is] inappropriate and unnecessarily harsh." *IT Group, 313 B.R. at 373.* Even though the information listed in *TWA* will eventually need to be proved, "it does not follow that it must be pleaded on pain of dismissal." n15 *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.), 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003)).*

n15 Notably, in *TWA,* the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that

case to allow the plaintiff to pursue details in discovery. *305 B.R. at 233-34.*

Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I, 30 at PP82-88), providing more information than did the complaint discussed in *TWA, see 305 B.R. at 232* ("Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million [*53] dollars."). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $ 2,076,000 (D.I. 30 at P88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that *Rule 8* requires. *Conley, 355 U.S. at 47.*

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media.* Count VI is sufficient to withstand the motion to dismiss.

5. Counts VII and VIII - Fraudulent Transfer Claims

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to *11 U.S.C. §§ 544* and *548.* In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of *11 U.S.C. § 544* and the Delaware Uniform Fraudulent Transfer Act. Defendants attack both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give [*54] fair notice of the basis for alleging a violation of *§ 544.* According to Defendants, the claim (1) lists payments made to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an "actual creditor" as required by *§ 544(b)*; and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, "for purposes of *Rule 12(b)(6)*, courts do not generally require a trustee to plead the existence of an unsecured creditor by name." *Pardo v. Avanti Corporate Health Sys. (In re APF Co.), 274 B.R. 634, 639 (Bankr. D. Del. 2001).* In any case, Plaintiff represents the interests of the unsecured creditors that are [*55] beneficiaries of the Litigation Trust. Finally, as discussed above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the *§ 544* claim in Count VII.

Next, Defendants argue that the *§ 548* claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition date. The Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the [debtor's] petition." *11 U.S.C. § 548(a)(1).* The IT Group filed its petition on January 16, 2002, so any transfers made before January 16, 2001 are outside the scope of *§ 548.* Therefore, the *§ 548* claim for the dividends paid from 1998 to 2000 must be dismissed (*see* Complaint, D.I. 30 at PP99-102), while the claim for payments made on or after January 16, 2001 (*see id. at P103*) may continue.

As to Count VIII, Defendants argue that the claims for fraudulent conveyances are untimely to the extent that they seek to recover transfers [*56] made before January 28, 2001. Delaware's Uniform Fraudulent Transfer Act provides that:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought . . . within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.

*6 Del. Code § 1309(1).* Since the Complaint was filed on January 28, 2005, Defendants argue that any claim for a payment made prior to January 28, 2001 is extinguished. But Plaintiff correctly points out that there is a factual issue concerning when the payments were or could reasonably have been discovered. Therefore, dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this *12(b)(6)* motion, except for the *§ 548* claims under Count VII for payments made prior to January 16, 2001, which must be dismissed.

6. Count IX - Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated *§ 174* of the Delaware General Corporation Law, *8 Del. Code § 174* [*57] , by paying dividends to the Car-

2005 U.S. Dist. LEXIS 27869, *

lyle Defendants from 1998 to 2001 while the IT Group was insolvent. *See EBS Litig. LLC v. Barclays Global Investors, N.A., 304 F.3d 302, 305 (3d Cir. 2002)* ("If the stock dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was illegal under Delaware law."). Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency during the time when the dividends were paid and the directors' knowledge of the insolvency. However, those arguments are not well-founded. The Complaint alleges that the IT Group was insolvent or in the vicinity of insolvency as early as March 1998. (D.I. 30 at P47.) Further, the booked goodwill associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's assets. (*Id.* at P41.) Finally, Defendants are alleged to have artificially extended the life of the insolvent IT Group in order to keep making payments to the Carlyle Defendants (*id.* at P61, P65, P69, P74), which is relevant for both the allegations of insolvency and of the directors' knowledge. Again, Defendants have notice of the basis of Plaintiff's claims, and Count IX therefore [*58] survives the *12(b)(6)* motion.

## V. CONCLUSION

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter Jurisdiction. I will grant the Motion to Dismiss for Failure to State a Claim as to the following:

(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;

(2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;

(3) Counts I, II, and III to the extent that they are brought against Defendant Soose;

(4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under *11 U.S.C. § 548*.

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS [*59] HEREBY ORDERED that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is GRANTED as to:

(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;

(2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;

(3) Counts I, II, and III to the extent that they are brought against Defendant Soose;

(4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under *11 U.S.C. § 548*.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is DENIED in all other respects.

UNITED    STATES    DISTRICT JUDGE

November 15, 2005
Wilmington, Delaware

LEXSEE 1994 US DIST LEXIS 10026



Positive
As of: Mar 08, 2007

## LEROY KEITT v. JOHN DOE, et al.

### CIVIL ACTION NO. 93-2968

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *1994 U.S. Dist. LEXIS 10026*

### July 21, 1994, Decided
### July 22, 1994, Filed; July 25, 1994, Entered

**COUNSEL:** [*1] For LEROY KEITT, PLAINTIFF: MARGARET M. KORAL, KORAL, KAHN & KORAL, P. C., PHILA, PA, SALVATORE J. CUCINOTTA, PHILA, PA, LEROY KEITT, PRO SE, PHILADELPHIA, PA, RICHARD J. HUNIGMAN, KORAL, KAHN AND KORAL, P.C., PHILA, PA.

For NATIONAL RAILROAD PASSENGER CORPORATION t/a "AMTRAK", DEFENDANT: RICHARD A. KRAEMER, CHRISTOPHER J. HOARE, MARSHALL, DENNEHEY, WARNER, COLEMAN AND GOGGIN, PHILA, PA.

**JUDGES:** HUTTON, J.

**OPINION BY:** HERBERT J. HUTTON

**OPINION:**

### MEMORANDUM AND ORDER

HUTTON, J.

Presently before the Court is the plaintiff Leroy Keitt's ("Keitt") Motion to Amend the Complaint and the defendant National Passenger Railroad Corporation's ("AMTRAK") response.

### I. BACKGROUND

This case involves Keitt's claim that he was assaulted by several police officers employed by AMTRAK. More specifically, he alleges that on either July 15 or July 16, 1991, he was walking near Penn Sta-

tion in New York City, when, without provocation, several officers assaulted him with fists and nightsticks and then arrested him. He further alleges that he suffered serious and permanent injuries as a result of the incident.

On June 3, 1993, the plaintiff filed his Complaint naming AMTRAK as a defendant and purporting to state claims [*2] under *42 U.S.C. §§ 1981* and *1983*, as well as various pendent state law claims. In his initial complaint, Keitt designated the officers, who allegedly had beaten him, as "John Doe" defendants. Pursuant to the local rules mandating voluntary self executing disclosure, AMTRAK forwarded certain discovery materials to Keitt on July 7, 1993. Included among the materials forwarded to Keitt was AMTRAK's "police reporting," describing the incident. The report also stated the names of the officers who had confronted Keitt in July, 1991.

On May 25, 1994, almost a year after learning the officers' true identities, Keitt filed the present motion to amend his complaint. Keitt seeks to amend his complaint in two respects. First, he seeks to correct the location of the alleged assault. In his initial complaint, Keitt incorrectly pled the location as 14th Street in New York, when, in fact, the location was 8th Avenue and 31st Street in New York. Second, Keitt seeks to replace the "John Doe" designations with the actual names of the AMTRAK police officers allegedly involved in the July, 1991 incident. Specifically, he seeks to name P. Pisano, A. Badamo and K. Fuchigami [*3] as defendants in this civil action.

### II. DISCUSSION

## A. Amendment of Pleadings Under the Federal Rules of Civil Procedure

*Federal Rule of Civil Procedure 15(a)* permits a party to amend a pleading by leave of court. "Leave shall be freely given when justice so requires." *Fed.R.Civ.P. 15(a)*. The rule

> embodies the liberal pleading philosophy of the federal rules. . . . This liberal amendment philosophy limits the district court's discretion to deny leave to amend. The district court may deny leave to amend only if a [party's] delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party. (citations omitted).

*Adams v. Gould, Inc., 739 F.2d 858, 864 (3d Cir. 1984);* see also *Charpentier v. Godsil, 937 F.2d 859, 864 (3d Cir. 1991)* (emphasizing the strong policy favoring liberality in allowing amendments under Rule 15(a); *Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989)* (same).

The Court's discretion under Rule 15(a) is confined by the requirement that a plaintiff must initiate his action within the applicable limitations period. In [*4] the present case, the Court's subject matter jurisdiction appears to be premised on the existence of a federal question pursuant to *28 U.S.C. § 1331*. n1 Thus, the threshold question is whether the plaintiff's motion to amend his complaint was filed within the applicable statute of limitations period applicable to the federal claims.

> n1 The plaintiff did not clearly articulate the basis for the Court's jurisdiction. Because the plaintiff did not state the citizenship of the defendants other than AMTRAK, the Court cannot ascertain whether diversity jurisdiction lies in the present case. See *28 U.S.C. § 1332*. However, the complaint references *42 U.S.C. §§ 1981* and *1983*, as the legal bases for two of the causes of action sought to be asserted. Accordingly, it appears that the plaintiff seeks to invoke federal question jurisdiction under § 1331.

Congress did not establish a statute of limitations for actions [*5] brought under § 1981 or § 1983. Rather, pursuant to the mandate of *42 U.S.C. § 1988*, n2 the courts have utilized analogous state statutes of limitations. In Wilson v. Garcia, the Supreme Court held that, as a matter of law, § 1983 actions should be characterized as personal injury actions for the purpose of deter-

mining the applicable statute of limitations. *471 U.S 261, 278 (1985)*. The same limitations period applicable to Keitt's § 1983 applies to his action under § 1981. See *Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985)* (holding that state statute of limitations for personal injury actions applies to § 1981 actions), aff'd, *482 U.S. 656, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)*. In Pennsylvania, the limitations period for personal injury actions is two years from the date the cause of action accrued. *42 Pa. Cons. Stat. Ann. § 5524(2)* (Purdon 1992). The cause of action accrues on the date that the plaintiff's injury is sustained. *Dreischalick v. Dalkon Shield Claimants Trust, 845 F. Supp. 310, 314 (W.D. Pa. 1994)* [*6] (citing *Ingenito v. AC & S, Inc., 633 A.2d 1172, 1174 (Pa. Super. Ct. 1993))*. An individual is injured "'when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable.'" Id. (quoting *Ayers v. Morgan, 397 Pa. 282, 154 A.2d 788, 792 (Pa. 1959))*.

> n2 *42 U.S.C. § 1988* provides:
>
> > The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of [the civil rights statutes] . . . shall be exercised and enforced in conformity with the laws of the United States . . .; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against the law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern said courts in the trial and disposition of the cause. . . .
>
> *42 U.S.C. § 1988* (West 1981).

[*7]

The plaintiff became aware of the injuries forming the basis of his federal action on July 15 or July 16, 1991. Thus, his causes of action accrued on that date. The statute of limitations expired two years later, on July

15 or July 16, 1993. However, the plaintiff did not move for leave to file an amended complaint until May 25, 1994, well after the statute of limitations had expired. Because the amended complaint will be filed, if at all, after the expiration of the applicable limitations period, amendment will only be permitted if Rule 15(c) is satisfied.

## B. Relation Back Under Rule 15(c)

### 1. The Factual Averment as to the Location of the Incident

Rule 15(c) provides in pertinent part that "an amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading . . . ." *Fed. R. Civ. P. 15(c)(2)*. Professors Wright and Miller explain that "when plaintiff attempts to allege an entirely different transaction by amendment, Rule 15(c) will not authorize relation back. . . . On the other hand, amendments that merely correct **[*8]** technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the Rule 15(c) test and will relate back." Charles A. Wright & Arthur R. Miller et al., Federal Practice and Procedure: Civil 2d, § 1497, at 70, 74 (West 1990). Indeed, courts within this circuit and elsewhere have recognized that an amended pleading which merely corrects a factual error contained in the original complaint, or provides greater factual specificity, arises out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original complaint, and thus, is within the scope of Rule 15(c)(2). See, e.g., *Bryn Mawr Hosp. v. Coatesville Elec. Supply , 776 F. Supp. 181, 186 (E.D. Pa. 1991); Marsh v. Coleman Co., Inc., 774 F. Supp. 608, 612 (D. Kan. 1991)* (concluding that "amendments will relate back if they only flesh out the factual details . . .").

The plaintiff seeks to amend his complaint to change the alleged location of the incident. Accordingly, he does not seek to add claims based on a different factual transaction than that which formed the basis of his initial complaint. Rather, he **[*9]** merely seeks to modify the facts alleged in the complaint and, thereby, to flesh out the factual details of the complaint. Because the claim asserted in the amended pleading arose out of the same conduct, transaction or occurrence set forth in the original pleading, the amended complaint relates back to the date of the original complaint.

Having concluded that the amended complaint is timely, the Court must determine whether, under Rule 15(a), the plaintiff is entitled to amend his complaint to change the location of the incident. As discussed, supra, Rule 15(a) is to be construed liberally in favor of permitting amendments. See *Fed. R. Civ. P. 15(a)*; *Charpentier, 937 F.2d at 864*. As the Bryn Mawr Hospital court observed, "in order to prevent a party from filing an amended complaint, the non-moving party must do more than simply claim to be prejudiced." *776 F. Supp. at 185*. Indeed, "a court will only refuse to allow an amendment if the opposing party can 'show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence.'" *Id. at 185-86* (quoting **[*10]** *Bechtel, 886 F.2d at 652)*.

AMTRAK has failed to make the requisite showing. The only reference to prejudice in AMTRAK's motion is AMTRAK's counsel's conclusory assertion that it would be "manifestly unjust" to allow plaintiff to amend his complaint by changing the facts at this time. However, AMTRAK does not state how it would be prejudiced by the change. Moreover, it is difficult to imagine how AMTRAK would be prejudiced in that AMTRAK's own incident report states that the confrontation with the plaintiff occurred at 8th Avenue and 31st Street, as the plaintiff seeks to allege in his amended complaint. In light of the foregoing, the Court grants the plaintiff leave to amend his complaint to plead 8th Avenue and 31st Street as the location of the incident.

### 2. Substitution of the Actual Parties for the "John Doe" Defendants

The plaintiff also seeks to amend his complaint to replace the "John Doe" defendants with the actual officers involved in the alleged assault. The Third Circuit has held that "replacing a 'John Doe' caption with a party's real name amounts to "changing a party" within the meaning of Rule 15(c)." *Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 174 (3d Cir. 1977);* **[*11]** see also *Talbert v. Kelly, 799 F.2d 62, 66 n.1 (3d Cir. 1986); Cruz v. City of Wilmington, 814 F. Supp. 405, 409 n.5 (D. Del. 1993)*. Where, as here, the plaintiff seeks to change a party, relation back is controlled by Rule 15(c)(3), which permits relation back of the amended pleading only if three conditions are satisfied. *Varlack, 550 F.2d at 174;* see also *Fed. R. Civ. P. 15(c)(3)*.

First, the claim or defense asserted in the amended pleading must arise out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original complaint. *Fed. R. Civ. P. 15(c)(3)*; *Varlack, 550 F.2d at 174*. Second, the plaintiff must show that "within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits." *Fed. R. Civ. P. 15(c)(3)(A)*. Third, it must be established that within the 4(m) period, the plaintiff "knew or should have known that, but for a mistake **[*12]** concerning the identity of

the proper party, the action would have been brought against him. *Fed. R. Civ. P. 15(c)(3)(B)*.

AMTRAK has not challenged the plaintiff's contention that the complaint and the amended complaint arise out of the same factual transaction. Indeed, it could not sustain such an argument because the only changes sought to be made, other than the averment as to the location of the incident, involve the substitution of the actual individuals purportedly involved in the assault for the previous "John Doe" designations. Accordingly, the first element of the test under Rule 15(c) is satisfied.

Further, that the third element of the Rule 15(c)(3) is satisfied has not been disputed by AMTRAK. As another court within this circuit recently held, "the 'mistake' condition in [the] third element is not limited to cases of misnamed or misdescribed parties, rather the Rule is widely-understood to allow the addition of new parties that were never originally named or described." *Heinly v. Queen, 146 F.R.D. 102, 107 (E.D. Pa. 1993);* see also *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc., 801 F. Supp. 1450, 1457 (E.D. Pa. 1992).* [*13] Indeed, in Varlack, the Third Circuit held that the third element of Rule 15(c)(3) was satisfied in an amendment adding the proper identity of a new defendant, designated as an "Unknown Employee" in his original complaint. See *Varlack, 550 F.2d at 175.* Similarly, in Heinly, the court held that the mistake condition was satisfied where, as here, the plaintiff designated a defendant as "John Doe" in the original complaint and, later, sought to amend the complaint after identifying the defendant's true identity. *Heinly, 146 F.R.D. at 107.* Accordingly, as in Varlack and Heinly, the mistake condition is satisfied in the present case. The propriety of relation back therefore turns on the issue of notice. More specifically, the amended complaint relates back to the filing date of the original complaint if the parties sought to be added knew or should have known within the period provided by Rule 4(m), that is, within 120 days after the complaint was filed, that the action would be brought against them. See *Fed. R. Civ. P. 15(c)(3).*

It is clear that "notice" for purposes of Rule 15(c) is not limited to actual [*14] notice. Rather, courts within this circuit have recognized that notice may be actual, constructive or imputed. See *Heinly, 146 F.R.D. at 106; Kinnally v. Bell of Pennsylvania, 748 F. Supp. 1136, 1141 (E.D. Pa. 1990)* (recognizing that informal notice satisfied Rule 15(c)). One such circumstances where courts have imputed notice is where the original party and the parties sought to be added were represented by the same attorney, who knew or should have known within the statute of limitation period plus 120 days that joinder was a distinct possibility. See id. Constructive notice may also be found if the party actually named in the original complaint and the party subsequently named

are "sufficiently related." *Schiavone v. Fortune, 477 U.S. 21, 29, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986).* Courts have described this second basis for the imputation of notice as the "identity of interests" tests. See *In re Westinghouse Securities Litig., 832 F. Supp. 989, 999 (W.D. Pa. 1993); In re Convertible Rowing Exerciser Patent Litig., 817 F. Supp. 434 (D. Del. 1993).* [*15]

The plaintiff has not alleged that the officers sought to be added received actual notice that they would be named as defendants. Rather, he argues that "by being employees of AMTRAK, the additional parties knew of the institution of the action . . . ." (Plaintiff's Mem. of Law at 3). The Court disagrees.

The question is whether, in a § 1983 action, notice may be imputed to individual officers alleged to have violated the plaintiff's rights where the officers' employer was named in the original complaint and where the officers were designated as "John Doe" defendants. Certainly, where the parties to be added shared the same attorney with their employer, who had been specifically named in the original complaint, courts have been willing to find implied notice by virtue of the notice provided to the officer's agent, that is, their attorney. See, e.g., *Younger v. Chernovetz, 792 F. Supp. 173, 176 (D. Conn. 1992); O'Brien v. City of Grand Rapids, 783 F. Supp. 1034, 1039 (W.D. Mich. 1992).*

However, unlike in Chernovetz and O'Brien, there is no indication that the Officers Badamo, Pisano or Fuchigami are represented [*16] by AMTRAK's attorney, as, to date, no one has entered an appearance on the officers' behalf. Further, in its Answer, AMTRAK has alleged an affirmative defense that would appear to be inconsistent with any notion of joint representation. The Answer states: "If it is determined at trial that the actions alleged in plaintiff's Complaint took place, it is averred that the officers in question acted outside the scope of the employer-employee relationship." (Defendant's Answer (Eighth Affirmative Defense)). In any event, there being no evidence of either actual notice to the officers or of joint representation by AMTRAK's attorney, the requirement of notice may be satisfied only if there is a "sufficient relationship" between AMTRAK and the officers.

The parties have not cited any case within this circuit, or elsewhere for that matter, holding that an employee will be deemed to have notice that it will be sued solely because its employer has received service of process. Indeed, there is persuasive case law to the contrary. In Perri v. Daggy, as here, the plaintiff brought a § 1983 action against a municipality, its police chief and a police officer, who was designated as "John Doe," [*17] alleging that the officer had used excessive force when he arrested him. *776 F. Supp. 1345, 1346 (N.D. Ill. 1991).*

After the statute of limitations had expired, the plaintiff sought to amend his complaint by substituting the officer's actual name for the "John Doe" designation. *Id. at 1349.* The officer had not received actual notice within the relevant time period that he would be sued. Id. Accordingly, Rule 15(c) notice would be satisfied only if notice could somehow be imputed to him.

As here, the plaintiff argued that notice should be imputed to the officer by virtue of the fact that his employer, the city, had actual notice within the 4(m), then 4(j), period. Id. The court rejected the plaintiff's argument, holding, "the court is not convinced . . . of the existence of such an identity of interest with the city as to warrant application of the exception [to the actual notice requirement]." Id. The Court, therefore, declined to permit relation back of the amended complaint to substitute the officer's actual name for the "John Doe" designation.

The Court is persuaded that Perri represents a sound application **[*18]** of the law. Non-management employees, such as the officers herein, do not bear a sufficient nexus with their employer to permit a conclusion that they share an identity of interest in the litigation so as to permit the presumption that they received notice that they would be sued simply because their employer had timely notice. Accordingly, pursuant to Rule 15(c), the plaintiff's motion to amend his complaint is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 21st day of July, 1994, upon consideration of the Plaintiff Leroy Keitt's ("Keitt") Motion to Amend the Complaint and the Defendant National Passenger Railroad Corporation's ("AMTRAK") response, IT IS HEREBY ORDERED that the Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER ORDERED that:

(1) the Plaintiff's Motion is **GRANTED** insofar as he seeks to amend his complaint to plead 8th Avenue and 31st Street as the location of the incident and **DENIED** insofar as he seeks substitute the names of the actual parties for the "John Doe" Defendants; and

(2) this case is **DISMISSED** as to P. Pisano, A. Badamo and K. Fuchigami, the "John Doe" Defendants.

BY THE COURT:

HERBERT J. HUTTON, **[*19]** J.

24 of 32 DOCUMENTS



Analysis
As of: Mar 08, 2007

**In re: WEBVAN GROUP, INC., et al., Debtors. R. TODD NEILSON, as the Responsible Individual/Disbursing Agent for WEBVAN GROUP, INC., et al., Reorganized Agent, Plaintiff, v. SHERI SOUTHERN, Defendant.**

**Chapter 11, Case No. 01-2404 (CGC), Adv. Proc. No. 03-54375 (CGC)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2004 Bankr. LEXIS 269*

**March 9, 2004, Decided**

**DISPOSITION:** [*1] Defendant's motion to dismiss denied.

**COUNSEL:** For Reorganized Debtors, on behalf of R. Todd Neilson, as Responsible Individual/Disbursing Agent for Reorganized Debtors: Laura Davis Jones, James E. O'Neill, Curtis A. Hehn, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE.

For Reorganized Debtors, on behalf of R. Todd Neilson, as Responsible Individual/Disbursing Agent for Reorganized Debtors: Kevin W. Coleman, Scott H. McNutt, McNutt & Litteneker, LLP, San Francisco, CA.

For Sheri Southern, Defendant: William D. Sullivan, Charles J. Brown, III, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, DE.

**JUDGES:** Charles G. Case, II, United States Bankruptcy Judge.

**OPINION BY:** Charles G. Case

**OPINION:**

**MEMORANDUM DECISION**

Dated: March 9, 2004

Case, J.

Before this Court is Sheri Southern's Motion to Dismiss [Adv. Docket No. 6] R. Todd Neilson's Complaint, on the grounds that the complaint fails to state a claim upon which the plaintiff is entitled to relief, pursuant to *Fed.R.Civ.P. 12(b)(6)* made applicable to the adversary proceeding through *Fed.R.Bankr.P. 7012* [*2] . For the following reasons, the Court denies the Defendant's Motion to Dismiss.

**FACTS**

On July 11, 2003, R. Todd Neilson (the "Plaintiff") filed and served the above-referenced Complaint. Sheri Southern (the "Defendant") answered the Complaint on August 11, 2003, asserting the following affirmative defenses: (1) ordinary course of business pursuant to *§ 547(c)(2) of the Bankruptcy Code*, (2) new value pursuant to *§ 547(c)(4) of the Bankruptcy Code*, and (3) failure to state a claim upon which relief may be granted pursuant to *Fed.R.Civ.P. 12(b)(6)*. On February 9, 2004, Defendant moved this Court to dismiss the Complaint. Completion of briefing was February 26, 2004.

Defendant seeks an Order dismissing Count One through Count Three of the Plaintiff's Complaint, which seeks to avoid preferential and fraudulent transfers, on the grounds that the Complaint fails to state a claim upon which relief may be granted. More specifically, the Defendant claims that the Plaintiff has merely recited the statute and has not provided factual information regarding (1) the date of the transfers, (2) the number of transfers, (3) what property was transferred, [*3] (4) the means of conveyance, (5) the amount of each individual

transfer, and (6) the alleged antecedent debt on account of which the transfers were made. In the alternative, the Defendant seeks an order requiring the Plaintiff to provide a more definite statement of its claim pursuant to *Fed.R.Civ.P. 12(c)*.

The Plaintiff objects to the Motion to Dismiss on the grounds that (1) the motion is untimely because the Defendant answered the Complaint, (2) Defendant's request for a more definite statement of the claim is untimely, (3) all facts germane to the claim have been stated as required by *Fed.R.Civ.P. 8*, and (4) the Complaint states a claim upon which relief may be granted. In the alternative, the Plaintiff seeks an order granting leave to file an amended complaint.

The Complaint alleges that Webvan acquired HomeGrocer.com, Inc. on September 5, 2000. Pursuant to Webvan and HomeGrocer.com's Merger Agreement, Webvan agreed to pay severance benefits to certain employees who were terminated after September 5, 2003. That after the acquisition, Sheri Southern, Vice President Technology Operations, remained employed [*4] by Webvan. On October 5, 2002, Webvan paid Sheri Southern a signing bonus in the amount of $ 35,000, and an additional $ 52,500 bonus on December 15, 2000. Sometime after September 5, 2000, Sheri Southern's employment was terminated. During the one-year preference period, July 13, 2000 and July 13, 2001, Webvan paid severance benefits to Sheri Southern in an amount of $ 98,437.50. Webvan's made one or more transfers to Sheri Southern in an aggregate amount not less than $ 185,937.50. Count One of the Complaint seeks to avoid the transfers made to Sheri Southern as preferences pursuant to *§ 547(b) of the Bankruptcy Code*, Count Two seeks to avoid the transfers to Sheri Southern as fraudulent conveyances pursuant to *§ 548(a)(1)(B) of the Bankruptcy Code*, and Count Three seeks to recover the avoided transfers for the benefit of the debtor pursuant to *§ 550(a)(1) of the Bankruptcy Code.*

### DISCUSSION

A defendant may move to dismiss a complaint on the grounds that the complaint fails to state a claim upon which relief may be granted pursuant to the *Fed.R.Civ.P. 12(b)(6)* made applicable by *Fed.R.Bank.P. 7012* [*5] . A motion to dismiss on these grounds is a drastic remedy, thus, the complaint should not be dismissed "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. This defense may be raised at any time prior to trial or at trial. In addition, the defendant may choose not to file a motion and may raise the defense in his answer.

In determining whether to grant a motion to dismiss on the grounds that the complaint fails to state a claim upon which relief may be granted, the Court is required to accept all of the allegations in the complaint as true, and draw all reasonable inferences in the light most favorable to the plaintiff. *See Hechinger Inv. Co. of Delaware Inc., v. M.G.H. Home Improvement (In re Hechinger Inv. Co. of Delaware Inc.), 288 B.R. 398, 400 (Bankr. D.Del. 2003)*.

The Federal Rules of Civil Procedure merely requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. Thus, this Court disagrees with [*6] a heightened pleading standard set forth in *TWA Inc. Post Confirmation Estate v. Marsh USA Inc. (In re TWA Inc. Post Confirmation Estate), 305 B.R. 228, 2004 WL 180421 *1 (Bankr. D.Del. 2004)* and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media), 288 B.R. 189, 192 (Bankr. D.Del. 2003)*. n1

> n1 In those cases, the court determined that a complaint seeking to avoid a transfer as a preference must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." *TWA Inc., 305 B.R. 228, 2004 WL 180421* at * 3, *citing, In re Valley Media., 288 B.R. at 192 (citation omitted)*. The court held that in a preference action "simply quoting the statutory language is not sufficient to survive a motion to dismiss." *TWA Inc., 305 B.R. 228, 2004 WL 180421* at * 2; *In re Valley Media, 288 B.R. at 192.* In addition, a party cannot provide specifics necessary to survive a motion to dismiss in its reply. *See TWA Inc., 305 B.R. 398, 2004 WL 180421* at * 3. In both cases, the court granted the defendants' motion to dismiss and granted leave to plaintiffs to amend their respective complaints.

[*7]

This Court must take the facts alleged in the Complaint as true, that the transfers made to the Defendant, an insider, are transfers to a creditor, on account of an antecedent debt (the Merger Agreement), while the company was insolvent, within one year prior to the petition date, and received more than it would have under chapter 7, if the transfer was never made, and received payment of its debt to the extent provided under the Bankruptcy Code. Thus pursuant to *§ 547(b) of the Bankruptcy Code*, the Defendant has set forth a claim upon which relief may be granted.

In addition, according to the facts alleged in the Complaint, the Plaintiff received less than the reasonable equivalent value in exchange for the $ 185,937.50 transfer to the Defendant, and that Webvan was insolvent at the time. Pursuant to *§ 548(a)(1)(B)* the Plaintiff has set forth a claim upon which relief may be granted.

This Court agrees with Judge Bernstein that (1) the Federal Rules of Bankruptcy Procedure does not impose a heightened pleading standard on preference claims, and (2) the heightened pleading standard could cut off valid claims prematurely. *In re Randall's Island Family Golf Centers, Inc., 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003).* [*8] Although a debtor should provide specific information when available, requiring such information at the pleading stage is a heavy burden given the time constraints for filing preference actions and the condition of the debtor's books and records. n2

> n2 Even in the *TWA Inc.* case, Judge Walsh indicated that the debtor might face difficulty in satisfying the elements set forth in the *In re Valley Media* case, thus the situation would warrant relaxation of the rule and the debtor would be entitled to pursue these details in discovery. *TWA Inc., 305 B.R. 228, 2004 WL 180421 *4.*

Lastly, the Court finds that the Plaintiff's reply is procedurally timely.

**CONCLUSION**

For the reasons set forth above, the Defendant's Motion to Dismiss is denied. If the Defendant wishes to proceed by dispositive motion at a later date, he may do so.

Charles G. Case, II

United States Bankruptcy Judge

**ORDER**

**AND NOW,** this 9 day of March, 2004, upon consideration of Defendant Sheri Southern's Motion to [*9] Dismiss (Adv. Docket No. 6) and the opposition thereto, and for the reasons set forth in the accompanying Memorandum Decision; it is hereby

**ORDERED** that Defendant's Motion to Dismiss is DENIED.

Charles G. Case II

United States Bankruptcy Judge